IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT

SCOTT TROOGSTAD, MARCUS HARRIS, GARY
DUSZAK, TIMOTHY SERBIN, RAUL DE LEON,
JOHN CUNNINGHAM, KENNETH BREZINA,
MARZENA SEMRAU, MICHELE GRABER, JOHN
KNIGHT, MICHAEL ZACH, ELVIS PEREZ,
NICHOLAS FORTUNA, MEGHAN MICHAELSEN,
JAMES WALSH, JEFFREY SUTTER, JENNIFER
KARABOYAS, JAMES DUIGNAN, NICK
PANTALEO, STEPHEN HODO, DAVID MARTIN,
DANIEL RIEGER, KELLY JOINER, JULIO
SANCHEZ, JR., ANGELA BANDSTRA, PHILIP
MARX, JOSEPH FORCHIONE, MARK
ABRATANSKI, RICH CLEMENS, ROBERT
TEBBENS, KRYSTAL KRANZ, GRANT VOSBURGH,
IRENE RES, MATT PALLER, BRIAN BRANTLEY,
DANIEL KAIRIS, ANTHONY ZUMARAS, RICHARD
LOUZON, FELIX SERRANO, LUIS QUINONES,
ROBERT SKALSKI, RYAN KELLY, ROBERTO
CORONADO, EDWARD SANTIAGO, MICHELLE
MAXWELL, BRENDAN BERRY, PAUL O'CONNOR,
WENDY LUCIANO, JULIAN SANTOS, STEVE
ANDOLINO, JOSEPH CUDAR, MICHAEL
OUELLETTE, ROBERT STOPKA, CHRIS GRANDE,
FLETCHER PRESTIDGE, COLLIN DUSZAK,
THOMAS FLAVIN, SETH MARTINEZ, MICHELE
MARTINEZ, PHILIP MOCKLER, DANIEL
BAUMGARTNER, SCOTT CHIBE, EMILY
PECORARO, ANTHONY PECORARO,
CHRISTOPHER ESTHERHAMMER-FIC, SANDRA
CHLEBOWICZ, CHRIS KING, JOHN DARDANES,
DAWN HEDLUND, DAVID LEON, VICTOR
MARTIN, FRANK PHEE, ROBERT MORRIS,
NICOLAS MINGHETTINO, MICHAEL CANNON,
NICHOLAS SMITH, ROBERT THOMPSON,
WILLIAM HURLEY, RYAN FRANZEN, DANIEL
KRANZ, JAMES SPALLA, STEVEN DORICH, ROY
ANDERSON, JR., DAVID MUELLER, MICHAEL
RICHIED, WESLEY SIENKIEWICZ, CLINT
RIVERA, KEVIN FERGUSON, JEFFREY KING,
ARLETT PAYNE, KELLEE SIMZ, SCOTT ROONEY,
HEATHER SCHERR, BERNARD CONSIDINE,
LEAH LAFEMINA ESCALANTE, STEPHEN
COYNE, REBIA BRADLEY, TRANG NGUYEN,

21 CV 5600

1

GARY HORKAVY, JAIME QUEZADA, THOMAS
SERBIN, RAUL MOSQUEDA, RAYMOND WILKE,
MICHAEL MALLOY, STEVEN PALUCK, BRET
LANDIS, JOHN HERZOG, JOHN BORNER,
MICHAEL DAHL, PABLO DELGADO, SHELTON
DAVIS, DANIEL KOENIG, JANET CONTURSI,
MATT WIECLAWEK, ANTHONY BAGGETT,
MICHAEL CRIEL, MATTHEW JOSEPH PUSATERI,
JOSE A. PEREZ, THOMAS T. MORRIS, DANIEL
McDERMOTT, MITCHELL FIGUEROA, ADAM
SAWYER, JOANN IMPARATO, JOHN MULLANEY,
MICHAEL REPEL, JAMES RAPPOLD, MONO
KACHATORIAN, MATTHEW A. BALANDES, SAAR
BRUCE SHAAR, DUHAMEL RENFORT, ANTHONY
MARTIN MAGGIO, CHRISTOPHER J. KAHR,
ERIK GOFF, TIMOTHY MALOY, and WILLIAM
PARKER, individually and on behalf of similarly
situated employees of CITY OF CHICAGO,

      Plaintiffs,

v.

CITY OF CHICAGO and GOVERNOR JAY
ROBERT PRITZKER,

      Defendants.

## COMPLAINT

Now Come SCOTT TROOGSTAD, MARCUS HARRIS, GARY DUSZAK, TIMOTHY
SERBIN, RAUL DE LEON, JOHN CUNNINGHAM, KENNETH BREZINA, MARZENA
SEMRAU, MICHELE GRABER, JOHN KNIGHT, MICHAEL ZACH, ELVIS PEREZ,
NICHOLAS FORTUNA, MEGHAN MICHAELSEN, JAMES WALSH, JEFFREY SUTTER,
JENNIFER KARABOYAS, JAMES DUIGNAN, NICK PANTALEO, STEPHEN HODO,
DAVID MARTIN, DANIEL RIEGER, KELLY JOINER, JULIO SANCHEZ, JR., ANGELA
BANDSTRA, PHILIP MARX, JOSEPH FORCHIONE, MARK ABRATANSKI, RICH
CLEMENS, ROBERT TEBBENS, KRYSTAL KRANZ, GRANT VOSBURGH, IRENE RES,
MATT PALLER, BRIAN BRANTLEY, DANIEL KAIRIS, ANTHONY ZUMARAS, RICHARD
LOUZON, FELIX SERRANO, LUIS QUINONES, ROBERT SKALSKI, RYAN KELLY,
ROBERTO CORONADO, EDWARD SANTIAGO, MICHELLE MAXWELL, BRENDAN
BERRY, PAUL O'CONNOR, WENDY LUCIANO, JULIAN SANTOS, STEVE ANDOLINO,
JOSEPH CUDAR, MICHAEL OUELLETTE, ROBERT STOPKA, CHRIS GRANDE,
FLETCHER PRESTIDGE, COLLIN DUSZAK, THOMAS FLAVIN, SETH MARTINEZ,
MICHELE MARTINEZ, PHILIP MOCKLER, DANIEL BAUMGARTNER, SCOTT CHIBE,
EMILY PECORARO, ANTHONY PECORARO, CHRISTOPHER ESTHERHAMMER-FIC,

2

SANDRA CHLEBOWICZ, CHRIS KING, JOHN DARDANES, DAWN HEDLUND, DAVID
LEON, VICTOR MARTIN, FRANK PHEE, ROBERT MORRIS, NICOLAS MINGHETTINO,
MICHAEL CANNON, NICHOLAS SMITH, ROBERT THOMPSON, WILLIAM HURLEY,
RYAN FRANZEN, DANIEL KRANZ, JAMES SPALLA, STEVEN DORICH, ROY
ANDERSON, JR., DAVID MUELLER, MICHAEL RICHIED, WESLEY SIENKIEWICZ,
CLINT RIVERA, KEVIN FERGUSON, JEFFREY KING, ARLETT PAYNE, KELLEE SIMZ,
SCOTT ROONEY, HEATHER SCHERR, BERNARD CONSIDINE, LEAH LAFEMINA
ESCALANTE, STEPHEN COYNE, REBIA BRADLEY, TRANG NGUYEN, GARY
HORKAVY, JAIME QUEZADA, THOMAS SERBIN, RAUL MOSQUEDA, RAYMOND
WILKE, MICHAEL MALLOY, STEVEN PALUCK, BRET LANDIS, JOHN HERZOG, JOHN
BORNER, MICHAEL DAHL, PABLO DELGADO, SHELTON DAVIS, DANIEL KOENIG,
JANET CONTURSI, MATT WIECLAWEK, ANTHONY BAGGETT, MICHAEL CRIEL,
MATTHEW JOSEPH PUSATERI, JOSE A. PEREZ, THOMAS T. MORRIS, DANIEL
McDERMOTT, MITCHELL FIGUEROA, ADAM SAWYER, JOANN IMPARATO, JOHN
MULLANEY, MICHAEL REPEL, JAMES RAPPOLD, MONO KACHATORIAN, MATTHEW
A. BALANDES, SAAR BRUCE SHAAR, DUHAMEL RENFORT, ANTHONY MARTIN
MAGGIO, CHRISTOPHER J. KAHR, ERIK GOFF, TIMOTHY MALOY, and WILLIAM
PARKER, individually and on behalf of similarly situated employees and contractors of CITY OF
CHICAGO, by and through their attorney, JONATHAN LUBIN, and Complain of CITY OF
CHICAGO and GOVERNOR JAY ROBERT PRITZKER, stating:

1.      In March, 2020, American life was irreparably changed both by COVID-19 and by the

various governments' response to it. During that time, paramedics – who were already heroes –

began to become ever more vital to the health and safety of millions of Americans. During that time,

fire fighters, EMTs and paramedics were on the front lines of society, granted "essential worker"

status due to the recognition of their importance in keeping society afloat during these trying times.

And during that time, City employees who were essential to the proper functioning of municipal

government came to their jobs and interacted with each other even as the rest of society sheltered in

place. As a result, many of these essential workers were put in contact, early on, with COVID-19

positive individuals, and many contracted COVID-19 as a result.

2.      Now, the Governor of the State of Illinois and the City of Chicago are threatening to

terminate employees in any arguable aspect of providing public health unless they agree to take a

vaccine for the SARS-COV-2 virus that causes COVID-19 (hereinafter, simply "COVID-19"),

despite the fact that many of these essential healthcare workers have already contracted COVID-19, and are therefore largely immune to contracting it again.

3. Further, the City of Chicago has expanded on the Governor's mandate to require all of the employees of the City of Chicago to be vaccinated by the end of this year, and, in the interim, to disclose their vaccination status and submit to twice-weekly testing COVID-19 testing.

4. The implication that these essential workers are somehow public health hazards is wrong, and does a disservice to them and to the health of the people in this State.

**Parties**

5. Scott Troogstad is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

6. Marcus Harris is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

7. Gary Duszak is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

8. Timothy Serbin is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

9. Raul De Leon is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

10. John Cunningham is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

11. Kenneth Brezina is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

12. Marzena Semrau is an employee of the City of Chicago, and is a member of the Fire Department. She does not believe she has contracted COVID-19.

13.     Michele Graber is an employee of the City of Chicago, and is a member of the Fire Department. She has previously tested positive for COVID-19.

14.     John Knight is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

15.     Michael Zach is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

16.     Elvis Perez is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

17.     Nicholas Fortuna is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

18.     Meghan Michaelsen is an employee of the City of Chicago, and is a member of the Fire Department. She does not believe she has contracted COVID-19.

19.     James Walsh is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

20.     Jeffrey Sutter is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

21.     Jennifer Karaboyas is an employee of the City of Chicago, and is a member of the Fire Department. She does not believe she has contracted COVID-19.

22.     James Duignan is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

23.     Nick Pantaleo is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

24.     Stephen Hodo is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

25.     David Martin is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

26.     Daniel Rieger is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

27.     Kelly Joiner is an employee of the City of Chicago, and is a member of the Fire Department. She has previously tested positive for COVID-19.

28.     Julio Sanchez, Jr., is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

29.     Angela Bandstra is an employee of the City of Chicago, and is a member of the Fire Department. She does not believe she has contracted COVID-19.

30.     Philip Marx is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

31.     Joseph Forchione is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

32.     Mark Abratanski is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

33.     Rich Clemens is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

34.     Robert Tebbens is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

35.     Krystal Kranz is an employee of the City of Chicago, and is a member of the Fire Department. She has previously tested positive for COVID-19. She has sought a religious exemption which has not been approved.

36. Grant Vosburgh is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

37. Irene Res is an employee of the City of Chicago, and is a member of the Fire Department. She has previously tested positive for COVID-19.

38. Matt Paller is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

39. Brian Brantley is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

40. Daniel Kairis is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

41. Anthony Zumaras is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

42. Richard Louzon is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracte COVID-19.

43. Felix Serrano is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

44. Luis Quinones is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

45. Robert Skalski is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19. He has sought a religious exemption which has not been approved.

46. Ryan Kelly is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

47.   Roberto Coronado is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

48.   Edward Santiago is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

49.   Michelle Maxwell is an employee of the City of Chicago, and is a member of the Fire Department. She does not believe she has contracted COVID-19.

50.   Brendan Berry is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19. He has sought a religious exemption which has not been approved.

51.   Paul O' Connor is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

52.   Wendy Luciano is an employee of the City of Chicago, and is a member of the Fire Department. She does not believe she has contracted COVID-19.

53.   Julian Santos is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

54.   Steve Andolino is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

55.   Joseph Cudar is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

56.   Michael Ouellette is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

57.   Robert Stopka is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

58.    Chris Grande is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

59.    Fletcher Prestidge is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

60.    Collin Duszak is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

61.    Thomas Flavin is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

62.    Seth Martinez is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

63.    Michele Martinez is an employee of the City of Chicago, and is a member of the Fire Department. She does not believe she has contracted COVID-19.

64.    Philip Mockler is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

65.    Daniel Baumgartner is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

66.    Scott Chibe is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

67.    Emily Pecoraro is an employee of the City of Chicago, and is a member of the Fire Department. She has previously tested positive for COVID-19.

68.    Anthony Pecoraro is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

69.    Christopher Esterhammer-Fic is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

70.    Sandra Chlebowicz is an employee of the City of Chicago, and is a member of the Fire Department. She does not believe she has contracted COVID-19. She has sought a religious exemption which has not been approved.

71.    Chris King is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

72.    John Dardanes is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

73.    Dawn Hedlund is an employee of the City of Chicago, and is a member of the Fire Department. She does not believe she has contracted COVID-19.

74.    David Leon is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

75.    Victor Martin is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19. He has sought a religious exemption which has not been approved.

76.    Frank Phee is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

77.    Robert Morris is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

78.    Nicolas Minghettino is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

79.    Michael Cannon is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

80.    Nicholas Smith is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

81. Robert Thompson is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

82. William Hurley is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

83. Ryan Franzen is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19. He has sought a religious exemption which has not been approved.

84. Daniel Kranz is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

85. James Spalla is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

86. Steven Dorich is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19. He has sought a religious exemption which has not been approved.

87. Roy Anderson, Jr., is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

88. David Mueller is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

89. Michael Richied is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

90. Wesley Sienkiewicz is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

91. Clint Rivera is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

92. Kevin Ferguson is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

93. Jeffrey King is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

94. Arlett Payne is an employee of the City of Chicago, and is a member of the Fire Department. She does not believe she has contracted COVID-19. She has sought a religious exemption which has not been approved.

95. Kellee Simz is an employee of the City of Chicago, and is a member of the Fire Department. She has previously tested positive for COVID-19. She has sought a religious exemption which has not been approved.

96. Scott Rooney is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

97. Heather Scherr is an employee of the City of Chicago, and is a member of the Fire Department. She has previously tested positive for COVID-19. She has sought a religious exemption which has not been approved.

98. Bernard Considine is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19. He has sought a religious exemption which has not been approved.

99. Leah Lafemina Escalante is an employee of the City of Chicago, and is a member of the Fire Department. She does not believe she has contracted COVID-19. She has sought a religious exemption which has not been approved.

100. Stephen Coyne is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19. He has sought a religious exemption which has not been approved.

101.    Rebia Bradley is an employee of the City of Chicago, and is a member of the Fire Department. She does not believe she has contracted COVID-19.

102.    Trang Nguyen is an employee of the City of Chicago, and is a member of the Fire Department. She does not believe she has contracted COVID-19.

103.    Gary Horkavy is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

104.    Jaime Quezada is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

105.    Thomas Serbin is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

106.    Raul Mosqueda is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

107.    Raymond Wilke is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19. He has sought a religious exemption which has not been approved.

108.    Michael Malloy is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

109.    Steven Paluck is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

110.    Bret Landis is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

111.    John Herzog is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe has contracted COVID-19.

112.     John Borner is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

113.     Michael Dahl is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

114.     Pablo Delgado is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19.

115.     Shelton Davis is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19. He has sought a religious exemption which has not been approved.

116.     Daniel Koenig is an employee of the City of Chicago, and is a member of the Fire Department. He has previously tested positive for COVID-19.

117.     Janet Contursi is an employee of the City of Chicago, and is a member of the Fire Department. She has previously tested positive for COVID-19.

118.     Matt Wieclawek is an employee of the City of Chicago, and is a member of the Fire Department. He does not believe he has contracted COVID-19

119.     Anthony Baggett is an employee of the City of Chicago, in the Water Department. He believes he has contracted COVID-19 in the past. He filed a religious exemption that was not accepted.

120.     Michael Criel is an employee of the City of Chicago, in the Water Department He does not believe he has contracted COVID-19.

121.     Matthew Joseph Pusateri is an employee of the City of Chicago, in the Water Department. He does not believe he has contracted COVID-19. He has sought a religious exemption which has not been approved.

122.    Jose A. Perez is an employee of the City of Chicago, in the Water Department. He does not believe he has contracted COVID-19. He has sought a religious exemption which has not been approved.

123.    Thomas T. Morris is an employee of the City of Chicago, in the Water Department. He does not believe he has contracted COVID-19. He filed a religious exemption that has not been granted.

124.    Daniel McDermott is an employee of the City of Chicago, in the Water Department. He does not believe he has contracted COVID-19.

125.    Mitchell Figueroa is an employee of the City of Chicago, in the Water Department. He does not believe he has contracted COVID-19. He has sought a religious exemption which has not been approved.

126.    Adam Sawyer is an employee of the City of Chicago, in the Water Department. He does not believe he has contracted COVID-19.

127.    Joann Imparato is an employee of the City of Chicago, in the Water Department. She does not believe she has contracted COVID-19. She has sought a religious exemption which has not been approved.

128.    John Mullaney is an employee of the City of Chicago, in the Department of Transportation. He does not believe he has contracted COVID-19.

129.    Michael Repel is an employee of the City of Chicago, in the Water Department. He does not believe he has contracted COVID-19.

130.    James Rappold is an employee of the City of Chicago, in the Water Department. He has been tested for COVID-19 and has documented immunity.

131.    Mono Kachatorian is an employee of the City of Chicago, in the Water Department. He has previously tested positive for COVID-19.

132.    Matthew A. Balandes is an employee of the City of Chicago, in the Water Department. He does not believe he has contracted COVID-19. He has sought a religious exemption which has not been approved.

133.    Saar Bruce Shaar is an employee of the City of Chicago, in the Water Department. He has previously tested positive for COVID-19 and has natural immunity.

134.    Duhamel Renfort is an employee of the City of Chicago, in the Water Department. He does not believe he has contracted COVID-19. He has sought a religious exemption which has not been approved.

135.    Anthony Martin Maggio is an employee of the City of Chicago, in the Water Department. He has previously tested positive for COVID-19. He has sought a religious exemption which has not been approved.

136.    Christopher J. Kahr is an employee of the City of Chicago, in the Water Department. He does not believe he has contracted COVID-19.

137.    Erik Goff is an employee of the City of Chicago, in the Water Department. He does not believe he has contracted COVID-19.

138.    Timothy Maloy is an employee of the City of Chicago, in the Water Department.

139.    William Parker is an employee of the City of Chicago, in the Water Department. He does not believe he has contracted COVID-19.

140.    The City of Chicago is a municipal corporation located in the Northern District of Illinois, Eastern Division.

141.    It employs all of the Plaintiffs, and has enacted the Complained of vaccine mandate.

142.    Governor Jay Robert Pritzker is the governor of the State of Illinois.

143.    He wrote the Executive Order (Executive Order 2021-22) that is at the center of the controversy surrounding the threatened termination of some of these Plaintiffs (specifically, those

firefighters who perform health care services as part of their job responsibilities) and other City employees.

## Jurisdiction and Venue

144.     This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1331 because the Complaint seeks equitable relief and damages under federal statutes and the US Constitution.

145.     This Court has supplemental jurisdiction over state-law claims pursuant to 28 U.S.C. § 1367 because the state-law claims are integrally related to the federal claims.

146.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the relevant events took place in the Northern District of Illinois.

## Facts Common to All Counts

147.     COVID-19 is a virus that was first detected in Wuhan, China, and eventually made its way to the United States of America, setting off a chain of events that has irretrievably changed the day-to-day life of many if not most Americans.

148.     When the virus first appeared in the United States, some believed that the number of deaths in America would reach 2.2 million[1]. This was based upon an assumption that the Infection Fatality Ratio was as high as 9% in some populations.

149.     Despite these terrifying predictions, essential workers continued to interact with each other and the public, frequently exposing themselves to people who were positive for COVID-19 in the process. Health care workers, including many of the firefighters here, were frequently among the first medical professionals to encounter patients who were suffering from COVID-19. As a result,

---

[1] Report 9: Impact of non-pharmaceutical interventions (NPIs) to reduce COVID-19 mortality and healthcare demand, accessed at https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-fellowships/Imperial-College-COVID19-NPI-modelling-16-03-2020.pdf.

paramedics became one of the hardest-hit subgroups in March and April of 2020 in terms of COVID-19 infections[2].

150.     Until now, no Defendant required employees to engage in periodic COVID-19 testing.

151.     This was true despite the fact that case rates in Illinois were highest in the fall and winter of 2020, were higher in May of 2020 and April of 2021 then they are today, and are presently on a downward trend[3].



152.     Relatively speaking, it is safer to be an Illinois resident today than at several different points, spanning weeks and months, over the last 18 months. Still, no vaccinations were required, despite widespread availability beginning in 2021.

153.     The National Institute of Health and other bodies have found that natural immunity to COVID-19 – that is, immunity caused by infection with COVID-19 and recovery – is incredibly strong. Specifically, antibodies against the spike protein of the COVID-19 virus remain in 98% of people who have recovered from the virus 6 to 8 months after infection (and the outer limit of the

---

[2] COVID-19 fatalities among EMS clinicians, accessed at https://www.ems1.com/ems-products/personal-protective-equipment-ppe/articles/covid-19-fatalities-among-ems-clinicians-BMzHbuegIn1xNLrP/.
[3] http://dph.illinois.gov/covid19/covid19-statistics

study was simply because the study was done on individuals who were 6 to 8 months out of recovery, not because immunity begins to wear off[4]).

154.    Health and Human Services' Assistant Secretary, Dr. Admiral Bret Diroir stated in August, 2021, in a nationally televised interview that "there are still no data to suggest vaccine immunity is better than natural immunity. I think both are highly protective."

155.    Even Dr. Anthony Fauci, one of the vaccines' chief proponents, admitted in September, 2021, while being interviewed on CNN that "I don't have a firm answer," on whether the vaccines offer immunity that was comparable to natural immunity.

156.    The data out of the State of Israel underscores this point. In a paper that is awaiting peer review, scientists out of the State of Israel report that in studying thousands of patients, those whose only source of immunity was a vaccine (in the case of Israel, the Pfizer vaccine was used) had a 5.96 to 13.06-fold increased risk of a breakthrough infection with the Delta variant of COVID-19 over those whose immunity was natural[5].

157.    Israel is one of the most vaccinated places in the world, with close to 80% of the country having been vaccinated.  Israel's bout with the Delta variant of COVID-19 has demonstrated that the Pfizer vaccine, once considered the Cadillac of the big three, is only 64% effective at preventing symptomatic cases of COVID-19[6].

158.    Despite its high vaccination rates, Israel is becoming "the world's COVID hotspot."[7]

159.    Here in this country, the now well-known study of the effects of natural immunity in the Cleveland Clinic Health System provides yet another example of the real-world superiority of natural immunity to vaccine immunity. That study compared "breakthrough infections" (that is, re-infection

---

[4] https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid
[5] https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf
[6] https://www.washingtonpost.com/politics/2021/07/19/vaccine-skeptics-zero-israel-again-some-reason/
[7] https://www.dailymail.co.uk/news/article-9951117/Israel-worlds-Covid-hotspot-0-2-population-catching-yesterday.html

after either contracting COVID-19 or taking a vaccine) among employees of the Cleveland Clinic Health System and found that of those who were previously infected and unvaccinated, 1359 people, none suffered breakthrough infections[8].

160.    A newly published study found that there is "no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases in the last 7 days." The study found, to the contrary, that there was "a marginally positive association such that countries with higher percentage of population fully vaccinated have higher COVID-19 cases per 1 million people." That study, which analyzed 68 different countries' vaccination rates and the rate of new COVID-19 cases, specifically referred to Israel, Portugal and Iceland, each of which is highly vaccinated and which had more cases per 1 million people than, for example, Vietnam and South Africa, which have around 10% of their population fully vaccinated.[9]

161.    Several scholarly journals have also weighed in on the superiority of natural immunity to vaccine immunity[10] [11]. Further, those who previously were infected with COVID-19 were at greater risk for bad side effects associated with the vaccine; in such cases, the vaccine might even weaken their pre-existing immunity[12].

162.    While the vaccines have been effective at preventing serious cases and deaths, they lag far behind natural immunity in preventing symptomatic cases of COVID-19, and, therefore, transmission of COVID-19.

163.    On September 3, 2021, Governor Pritzker issued Executive Order 2021-22. That order requires any Health Care Worker to have the first dose of a COVID-19 vaccine by September 19,

---

[8] https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3
[9] Subramanian, S.V., Kumar, A. Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States. Eur J Epidemiol (2021). https://doi.org/10.1007/s10654-021-00808-7
[10] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3838993
[11] https://www.nature.com/articles/s41586-021-03647-4
[12] https://www.biorxiv.org/content/10.1101/2021.03.22.436441v1

2021, and to have taken a second dose within 30 days after the first dose. EO 2021-22(2)(b), attached as Exhibit A.

164.     Health Care Workers include any person who is employed by a Health Care Facility (other than state-owned facilities) and/or has frequent contact with patients and personnel within the facility, including those who work as EMS personnel in ambulances.

165.     The executive order is a continuation of the state of emergency declared by the Governor in March, 2020, pursuant to the Illinois Emergency Management Agency Act. 20 ILCS 3305 *et seq.*

166.     That statute states that "[u]pon such proclamation, the Governor shall have and may exercise for a period not to exceed 30 days" certain enumerated powers. 20 ILCS 3305/7.

167.     Several decisions of the Northern District of Illinois have pertained to the limitation placed on the governor by the simple text of the statute: he may exercise his power "for a period not to exceed 30 days." These decisions have largely found that so long as the governor makes new findings of fact, he may extend these emergency orders (or, more accurately, issue new orders). See, for instance, Cassell v. Snyders, 458 F.Supp.3d 981 (Ill. N.D., 2020).

168.     In the case of Cassell specifically, the Court pointed out that while the governor could extend the emergency orders, his power is not unlimited. As Cassell finds, "[o]nce an emergency has abated, the facts on the ground will no longer justify such findings, and the Governor's emergency powers will cease. And, should this or any future Governor abuse his or her authority by issuing emergency declarations after a disaster subsides, affected parties will be able to challenge the sufficiency of those declarations in court." Cassell v. Snyders, 458 F. Supp. 3d 981, 1002 (N.D. Ill. 2020).

169.     Though COVID-19 is still very much a part of the lives of nearly every Illinoisan, the cases are presently on the wane, and there are many fewer new cases today (to say nothing of deaths) than there were at several other points over the last 18 months.

170.    The Illinois Emergency Management Act enumerates the temporary unilateral powers of the governor. Specifically, it lists the following powers:

(1) To suspend the provisions of any regulatory statute prescribing procedures for conduct of State business, or the orders, rules and regulations of any State agency, if strict compliance with the provisions of any statute, order, rule, or regulation would in any way prevent, hinder or delay necessary action, including emergency purchases, by the Illinois Emergency Management Agency, in coping with the disaster.

(2) To utilize all available resources of the State government as reasonably necessary to cope with the disaster and of each political subdivision of the State.

(3) To transfer the direction, personnel or functions of State departments and agencies or units thereof for the purpose of performing or facilitating disaster response and recovery programs.

(4) On behalf of this State to take possession of, and to acquire full title or a lesser specified interest in, any personal property as may be necessary to accomplish the objectives set forth in Section 2 of this Act, including: airplanes, automobiles, trucks, trailers, buses, and other vehicles; coal, oils, gasoline, and other fuels and means of propulsion; explosives, materials, equipment, and supplies; animals and livestock; feed and seed; food and provisions for humans and animals; clothing and bedding; and medicines and medical and surgical supplies; and to take possession of and for a limited period occupy and use any real estate necessary to accomplish those objectives; but only upon the undertaking by the State to pay just compensation therefor as in this Act provided, and then only under the following provisions:

a. The Governor, or the person or persons as the Governor may authorize so to do, may forthwith take possession of property for and on behalf of the State; provided, however, that the Governor or persons shall simultaneously with the taking, deliver to the owner or his or her agent, if the identity of the owner or agency is known or readily ascertainable, a signed statement in writing, that shall include the name and address of the owner, the date and place of the taking, description of the property sufficient to identify it, a statement of interest in the property that is being so taken, and, if possible, a statement in writing, signed by the owner, setting forth the sum that he or she is willing to accept as just compensation for the property or use. Whether or not the owner or agent is known or readily ascertainable, a true copy of the statement shall promptly be filed by the Governor or the person with the Director, who shall keep the docket of the statements. In cases where the sum that the owner is willing to accept as just compensation is less than $1,000, copies of the statements shall also be filed by the Director with, and shall be passed upon by an Emergency Management Claims Commission, consisting of 3 disinterested citizens who shall be appointed by the Governor, by and with the advice and

consent of the Senate, within 20 days after the Governor's declaration of a disaster, and if the sum fixed by them as just compensation be less than $1,000 and is accepted in writing by the owner, then the State Treasurer out of funds appropriated for these purposes, shall, upon certification thereof by the Emergency Management Claims Commission, cause the sum so certified forthwith to be paid to the owner. The Emergency Management Claims Commission is hereby given the power to issue appropriate subpoenas and to administer oaths to witnesses and shall keep appropriate minutes and other records of its actions upon and the disposition made of all claims.

b. When the compensation to be paid for the taking or use of property or interest therein is not or cannot be determined and paid under item a of this paragraph (4), a petition in the name of The People of the State of Illinois shall be promptly filed by the Director, which filing may be enforced by mandamus, in the circuit court of the county where the property or any part thereof was located when initially taken or used under the provisions of this Act praying that the amount of compensation to be paid to the person or persons interested therein be fixed and determined. The petition shall include a description of the property that has been taken, shall state the physical condition of the property when taken, shall name as defendants all interested parties, shall set forth the sum of money estimated to be just compensation for the property or interest therein taken or used, and shall be signed by the Director. The litigation shall be handled by the Attorney General for and on behalf of the State.

c. Just compensation for the taking or use of property or interest therein shall be promptly ascertained in proceedings and established by judgment against the State, that shall include, as part of the just compensation so awarded, interest at the rate of 6% per annum on the fair market value of the property or interest therein from the date of the taking or use to the date of the judgment; and the court may order the payment of delinquent taxes and special assessments out of the amount so awarded as just compensation and may make any other orders with respect to encumbrances, rents, insurance, and other charges, if any, as shall be just and equitable.

(5) When required by the exigencies of the disaster, to sell, lend, rent, give, or distribute all or any part of property so or otherwise acquired to the inhabitants of this State, or to political subdivisions of this State, or, under the interstate mutual aid agreements or compacts as are entered into under the provisions of subparagraph (5) of paragraph (c) of Section 6 to other states, and to account for and transmit to the State Treasurer all funds, if any, received therefor.

(6) To recommend the evacuation of all or part of the population from any stricken or threatened area within the State if the Governor deems this action necessary.

(7) To prescribe routes, modes of transportation, and destinations in connection with evacuation.

(8) To control ingress and egress to and from a disaster area, the movement of persons within the area, and the occupancy of premises therein.

(9) To suspend or limit the sale, dispensing, or transportation of alcoholic beverages, firearms, explosives, and combustibles.

(10) To make provision for the availability and use of temporary emergency housing.

(11) A proclamation of a disaster shall activate the State Emergency Operations Plan, and political subdivision emergency operations plans applicable to the political subdivision or area in question and be authority for the deployment and use of any forces that the plan or plans apply and for use or distribution of any supplies, equipment, and materials and facilities assembled, stockpiled or arranged to be made available under this Act or any other provision of law relating to disasters.

(12) Control, restrict, and regulate by rationing, freezing, use of quotas, prohibitions on shipments, price fixing, allocation or other means, the use, sale or distribution of food, feed, fuel, clothing and other commodities, materials, goods, or services; and perform and exercise any other functions, powers, and duties as may be necessary to promote and secure the safety and protection of the civilian population.

(13) During the continuance of any disaster the Governor is commander-in-chief of the organized and unorganized militia and of all other forces available for emergency duty. To the greatest extent practicable, the Governor shall delegate or assign command authority to do so by orders issued at the time of the disaster.

(14) Prohibit increases in the prices of goods and services during a disaster. 20 ILCS 3305/7.

171.    The entirety of the text is brought here to underscore what the statute does not state. The sections pertaining to the governor's power to direct traffic, ingress and egress, and commerce arguably give the governor the power to impose lockdowns. But there is no statutory authority in 20 ILCS 3305/7 that permits the governor to require vaccination of employees, or to direct the terms of their employment.

172.    Further, the act specifically limits the governor's power in stating that the Act shall not be construed to "[a]ffect the jurisdiction or responsibilities of police forces, fire fighting forces, units of the armed forces of the United States, or of any personnel thereof, when on active duty; but State

and political subdivision emergency operations plans shall place reliance upon the forces available for performance of functions related to emergency management." 20 ILCS 3305/3(c).

173.    The legislature has not amended this Act in response to the COVID-19 epidemic, and has not otherwise authorized the Governor's Executive Order.

174.    Similarly, the City of Chicago, through the Office of the Mayor, created a policy that requires all employees, including those employees who are not Health Care Workers, to be vaccinated by October 15, 2021, or to undergo twice weekly testing.

175.    The City of Chicago mandate requires employees to enter their vaccination status into an online portal (there is no option to submit their status in paper, or over any other more secure medium) or face unpaid leave or suspension.

176.    Employees who persist in not entering their vaccine information into the online portal face potential suspension and termination. Several of the Plaintiffs here have already been placed on "no pay status."

177.    The "soft mandate" is presently set to end at the end of 2021, and will then be replaced by a "hard mandate," which does not permit employees to test twice weekly in order to remain employed.

178.    Employees are permitted to seek exemptions. However, the exemptions can only be sought using forms provided by the City of Chicago.

179.    The form for a religious exemption request requires the signature of a religious or a spiritual leader. It requires employees to identify their religion, their religious belief that conflicts with their taking the COVID-19 vaccine and the "specific way that your religious beliefs prevent you from being vaccinated."

180.    It also asks when the employee began practicing this religion or following their beliefs, and whether their religious beliefs include objections to other vaccines or medications.

181.    Given that the requirements of this form are more onerous than the much less onerous requirements of either Title VII of the Civil Rights Act or the Free Exercise clause of the First Amendment, many plaintiffs believed that by filling out these forms they were setting themselves up for failure. Indeed, many of the Plaintiffs here did fill out their forms and their exemptions were not accepted despite their deeply held religious beliefs.

182.    For example, whether a party can get the signature of a spiritual or religious leader is irrelevant to whether they have a deeply held conviction that requires a reasonable accommodation.

183.    The City of Chicago ordinances state that "no employer shall refuse to make all reasonable efforts to accommodate the religious beliefs, observances, and practices of employees… unless the employer demonstrates that he is unable to reasonably accommodate an employee's… religious observance or practice without undue hardship on the conduct of the employer's business." 2-16-050.

184.    The City of Chicago ostensibly provides each employee who is discharged or suspended for ten days or more the right to a hearing before the human resources board. 2-74-060. However, the City of Chicago is now summarily suspending employees without pay if they do not utilize the portal and disclose their vaccination status.

185.    Like the Governor's mandate, this one was not authorized by a vote of the City Council. Rather, it was unilaterally undertaken by the Mayor despite being a fundamental change in the requirements and terms of employment.

186.    The Supreme Court has recognized many times that the right to privacy (including bodily autonomy) is one of the fundamental rights protected by the constitution. For example, Roe v.

Wade, 410 U.S. 113 (1973) points to several prior decisions of the Supreme Court identifying various amendments in the Bill of Rights as the source of this right[13].

187.    In Roe specifically, the Supreme Court noted that the right of women to procure an abortion existed despite the State of Texas's belief (consistent with the beliefs of many of the world's religions, and the beliefs of many people of conscience) that the life of a fetus begins at conception. *Id.* at 159. That is to say, bodily autonomy trumps even the possibility that the assertion of the same would be directly responsible for the termination of a human life.

188.    Whenever a fundamental right is implicated, the Supreme Court tells us, Courts must apply strict scrutiny in evaluating the constitutionality of the laws at issue. Specifically, Supreme Court states that the state may only threaten that interest when it is justified by a "compelling state interest," and that the "legislative enactments must be narrowly drawn to express only the legitimate state interests at stake. Roe v. Wade, 410 U.S. 113, 155 (1973); Planned Parenthood of Se. Pennsylvania v. Casey, 505 U.S. 833, 871 (1992).

189.    As the Supreme Court has found elsewhere, "[t]he guaranties of due process, though having their roots in Magna Carta's *per legem terrae'* and considered as procedural safeguards 'against executive usurpation and tyranny,' have in this country 'become bulwarks also against arbitrary legislation." Planned Parenthood of Se. Pennsylvania v. Casey, 505 U.S. 833, 847(1992). Casey also ruled that the "State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims." *Id.* at 857.

190.    In Washington v. Harper, 495 U.S. 210 (1990), the Supreme Court found that the forced injection of medicine implicated a "significant liberty interest." Similarly, in Cruzan v. Director,

---

[13] Specifically, it points to the First Amendment, Stanley v. Georgia, 394 U.S. 557, 564 (1969); the Fourth and Fifth Amendments, Terry v. Ohio, 392 U.S. 1, 8-9 (1968), Katz v. United States, 389 U.S. 347, 350 (1967); Boyd v. United States, 116 U.S. 616 (1886), Olmstead v. United States, 277 U.S. 438 (1928)(Brandeis, dissenting); the "penumbras of the Bill of Rights, Griswold v. Connecticut, 381 U.S. 479, 484-5 (1965); and the Ninth Amendment, *Id.*

Missouri Dep't of Health, 497 U.S. 261, 278 (1990), the Supreme Court found that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment."

191.    In this case, the mandate at issue is not narrowly tailored to forward a compelling government interest.

192.    Vaccinating people is not a compelling government interest in and of itself. Rather, the government's interest is in protecting the lives and fundamental rights of the state's residents.

193.    Presently, COVID-19 cases are on the wane in Illinois, and, as stated above, there were many periods over the last 18 months when the number of new cases per day was much greater than at present. Nonetheless, there was no time during that period when weekly COVID-19 tests were required of employees or contractors. There was also no time, over the last nine months when vaccines have been available, when a vaccine mandate was put in place in the State of Illinois, or in the City of Chicago.

194.    It is therefore evident that the weekly testing requirement is not narrowly tailored to forward the interest of preserving the life and health of Illinois' citizens; rather, it is a punitive measure taken against those who assert their fundamental rights.

195.    Given that many firefighters, EMTs, and paramedics have already caught and recovered from COVID-19, singling out those who are not vaccinated against COVID-19 is neither narrowly tailored to nor rationall related to forwarding the interest of preserving the life and health of Illinois' citizens; those who have not had COVID-19, and whose immunity comes from vaccination, are at a much greater risk of catching and transmitting COVID-19 to others than those who remain unvaccinated but who have natural immunity.

196.    The mandate is being applied inconsistently in that some employees (namely, teachers) are permitted to test once per week, and the test is brought to their employment at no cost, while

Plaintiffs here are required to test on their own time, twice per week, and to bear the costs if there ae any.

## COUNT I
## 42 U.S.C. § 1983
## Substantive Due Process

197.    If Defendants are not enjoined from putting the mandate into effect, their fundamental rights will be violated.

## COUNT II
## 42 U.S.C. § 1983
## Procedural Due Process

198.    The actions of the City were taken without providing Plaintiffs due process of law.

199.    Further, the Governor did not have the authority to enter the Executive Order. The imposition on Plaintiff health care workers – including the members of the Fire Department who perform health care services – was therefore taken without due process of law.

## COUNT II
## 42 U.S.C. § 1983
## Equal Protection

200.    As a result of the Executive Order, and the contemplated actions, Plaintiffs are being treated differently from employees who are willing to disclose their vaccination status arbitrarily, and singled out for disparate treatment.

## COUNT III
## 42 U.S.C. § 1983
## First Amendment

201.    Plaintiffs were denied religious exemptions, or their exemptions remain unapproved, despite the fact that the City of Chicago gave itself the discretion to grant such exemptions for good cause.

## COUNT IV
## 745 ILCS 70 *et seq* – Health Care Right of Conscience Act

202.    Pursuant to the Health Care Right of Conscience Act:

>   Discrimination. It shall be unlawful for any person, public or private
>   institution, or public official to discriminate against any person in any
>   manner, including but not limited to, licensing, hiring, promotion, transfer,
>   staff appointment, hospital, managed care entity, or any other privileges,
>   because of such person's conscientious refusal to receive, obtain, accept,
>   perform, assist, counsel, suggest, recommend, refer or participate in any way
>   in any particular form of health care services contrary to his or her
>   conscience. 745 ILCS 70/5.

203.    It also states:

>   Discrimination by employers or institutions. It shall be unlawful for any
>   public or private employer, entity, agency, institution, official or person,
>   including but not limited to, a medical, nursing or other medical training
>   institution, to deny admission because of, to place any reference in its
>   application form concerning, to orally question about, to impose any burdens
>   in terms or conditions of employment on, or to otherwise discriminate
>   against, any applicant, in terms of employment, admission to or participation
>   in any programs for which the applicant is eligible, or to discriminate in
>   relation thereto, in any other manner, on account of the applicant's refusal to
>   receive, obtain, accept, perform, counsel, suggest, recommend, refer, assist or
>   participate in any way in any forms of health care services contrary to his or
>   her conscience. 745 ILCS 70/7.

204.    Violation of the Act subjects the violator to threefold the actual damages, including

pain and suffering, costs of bringing suit, and reasonable attorneys' fees.

## COUNT V
## Declaratory Judgment

205.    The Executive Order, and the mandate upon which it is based, far exceeds the power of the

governor granted to him by Illinois statute.

206.    The Illinois Emergency Management Act, which the governor points to as authorizing the

vaccine mandates, does not give the governor the power to require employees to be vaccinated. This

aspect of the Executive Order violates Illinois law and statute.

207.    Similarly, Chicago's mandate was undertaken in violation of the law in that it was never approved by the City Council.

208.    Further, the factual basis underlying the Executive Orders are woefully inadequate to justify such an imposition on the constitutional and fundamental rights of Illinois and Chicago residents.

209.    Finally, the mandate, and the Executive Orders, violate the constitutional and fundamental rights of those who either choose not to be vaccinated, or choose not to disclose their vaccination status to either the state, or their employers.

**Prayer for Relief**

WHEREFORE, Plaintiffs request that this Honorable Court enter an order:

A.  Finding that the government Defendants, violated the constitutional rights of Plaintiffs;

B.  Finding that the Executive Order, and therefore the mandate, exceeds the authority granted to the governor and to governmental units granted by statute, and is therefore null and void as to the vaccine mandates complained of here;

C.  Finding that the City of Chicago Order, and therefore the mandate, exceeds the authority granted to the Mayor of Chicago, and is therefore null and void;

D.  Finding that Plaintiffs have a fundamental right to their bodily autonomy, and to make health decisions in accordance with their beliefs and conscience;

E.  Ordering that Defendants be enjoined from putting the vaccine mandates contained in the Executive Order and the City of Chicago mandate into effect;

F.  Ordering that Plaintiffs be compensated, to the extent allowable under the law and the Constitution of the United States of America, including treble damages under Illinois Statute, for their damages; and

G.  Ordering that Defendants pay Plaintiffs' for the costs associated with bringing this lawsuit, including their reasonable attorneys' fees.

Respectfully Submitted,

s/Jonathan Lubin
Attorney for Plaintiffs

Jonathan Lubin
8800 Bronx Ave.
Suite 100H
Skokie, IL 60077
773 954 2608
jonathan@lubinlegal.com