IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT

SCOTT TROOGSTAD, *et al,*

     Plaintiffs,

v.                                     2021 CV 5600

CITY OF CHICAGO, *et al,*

     Defendants.

**PLAINTIFFS' EMERGENCY PETITION FOR A TEMPORARY RESTRAINIG ORDER
AND PRELIMINARY INJUNCTION**

     Plaintiffs, individually and on behalf of similarly situated employees of the CITY OF
CHICAGO, by and through their attorney, JONATHAN LUBIN, hereby request that this
Honorable Court enter a Temporary Restraining Order and Preliminary Injunction, enjoining
Defendants from requiring them to disclose their vaccination status, and to vaccinate or face
suspension or termination, and from enforcing Executive Order 2021-22, specifically, the
vaccination mandate portion thereof, and state in support of the same:

**Introduction and Facts**

     In apparent response to an uptick in COVID-19 cases in Illinois that now appears to be on
the wane[1], the Governor of the State of Illinois instituted a vaccine mandate covering, among others,
"Health Care Workers." Exhibit A, Executive Order 2021-22. The definition of "Health Care
Workers" in the mandate is extremely broad, and includes anybody operating out of an ambulance
or who spends significant time in a hospital in a given week professionally. City of Chicago followed
up with its own mandate, which is much more all-encompassing than the Governor's. Unlike the
Governor's, Chicago's mandate applies to all employees. For the moment, the mandate requires
employees to submit their vaccination status online through a portal on pain of suspension without

---

[1] https://www.nbcchicago.com/news/coronavirus/coronavirus-in-illinois-25956-new-covid-cases-285-deaths-142k-
vaccinations-in-the-past-week/2615562/

pay. Those who do submit their status who are unvaccinated must test twice weekly. All of this is scheduled to change, as at the end of the year, the City will stop allowing those who have not vaccinated to test twice weekly. They will simply be placed on unpaid leave and terminated. As a result, all of these Plaintiffs now stand to lose their jobs due to their deeply held beliefs that they should not take the COVID-19 vaccine.

When COVID first reared its head on American soil (or, at least, when it was discovered here), some estimates suggested that as many as 2.2 million Americans could or would die of it. Complaint at ¶ 147. Plaintiffs here are a group of employees of the City of Chicago. Several of them work in the Water Department. The rest are firefighters, some of whom provide EMS services as paramedics. Complaint at ¶¶ 5-141. Despite the fact that many of these Plaintiffs have been exposed to COVID-19 as part of their job, at no point until the immediate present were Plaintiffs ever forced to submit to regular COVID-19 testing, despite its widespread availability. Complaint at ¶¶ 149-150. This was true at the peak of the epidemic, during the fall and winter of 2020, and again in April of 2021. Complaint at ¶ 151. Today, the rate of new cases is far lower than at both of those points, and is falling. Complaint at ¶ 152. Nonetheless, the requirement of weekly COVID-19 testing was not imposed until now.

Some of Plaintiffs have already had COVID-19. Complaint at ¶¶ 5-141. The National Institute of Health and other bodies have found that natural immunity to COVID-19 – that is, immunity caused by infection with COVID-19 and recovery – is incredibly strong. Specifically, antibodies against the spike protein of the COVID-19 virus remain in 98% of people who have recovered from the virus 6 to 8 months after infection (and the outer limit of the study was simply because the study was done on individuals who were 6 to 8 months out of recovery, not because immunity begins to wear off[2]). Complaint at ¶ 153. Many public figures on the forefront of our

---

[2] https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19

nation's response to COVID-19 have admitted publicly that natural immunity is at least as strong as vaccine immunity. See Complaint at ¶ 154. Even Dr. Anthony Fauci has stated that he does not "have a firm answer" on whether vaccine immunity is superior to natural immunity. Complaint at ¶ 155.

In the State of Israel, vaccines are now providing less and less complete protection, and have far been eclipsed by natural immunity. Complaint at ¶¶ 156-7. A newer study now finds that there is no correlation between the percentage of a population that is vaccinated and new cases over a 7 day period. Complaint at ¶ 160.

Meanwhile, several Scandinavian countries have paused usage of the Moderna vaccine due to concerns about its safety, particularly as it relates to the vaccine's impact on the heart[3].

The Governor's Executive Order is allegedly authorized by the Illinois Emergency Management Act, 20 ILCS 3305 *et seq*. That act gives the governor the power, in the case of an emergency, to temporarily take sweeping and drastic ***enumerated*** measures to mitigate the disaster. See Complaint at ¶¶ 170, 20 ILCS 3305/7. However, none of those powers includes the power to force employers to terminate employees, to regulate the terms of their employment, or to force anybody to take a vaccination. See Complaint at ¶¶ 171. There is a further limitation in that the Act shall not be construed to "affect the jurisdiction or responsibilities of police forces or fire fighting forces. 20 ILCS 3305/3(c).

In this case, not only are Plaintiffs burdened by the Governor's Executive Order, but they also have to contend with a much more sweeping Executive Order entered by the City of Chicago which covers all employees. Complaint ¶ 174. At this point, it requires all employees to upload their vaccination status to an online portal. Plaintiffs have no option to submit their status using a more

---

[3] https://www.msn.com/en-us/news/world/scandinavians-curb-moderna-shots-for-some-younger-patients/ar-AAPcl0G

secure method. Complaint at ¶ 175. Where others municipalities have treated employees who do not violate their privacy by disclosing their status simply as unvaccinated, Chicago is requiring total obedience to the disclosure requirement. Employees who do not disclose their status are suspended without pay. Complaint at ¶ 175. Eventually, the mandate converts to a hard mandate at the end of this year: all employees will be suspended and then terminated if they do not vaccinate. Complaint at ¶ 177. Many plaintiffs have applied for a reasonable accommodation based on their deeply held religious beliefs and were denied. Complaint at ¶ 50. The other Plaintiffs did not apply for an accommodation because the City requires employees to use their form, which goes well beyond what the law requires for reasonable accommodations. Complaint at 179, Exhibit B, Form.

This Motion incorporates the Complaint, the most pertinent allegations of which have been repeated here. It is also supported by affidavits which are attached as Exhibit C hereto.

## Argument

A plaintiff seeking a preliminary injunction must establish 1.) that he is likely to succeed on the merits, 2.) that he is likely to suffer irreparable harm in the absence of preliminary relief, 3.) that the balance of equities tips in his favor, and that an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008). Each of these factors weighs heavily in favor of Plaintiffs.

### I.    Plaintiffs are likely to succeed on the merits of their case.

There is a likelihood of success on the meris for four reasons: 1.) both Executive Orders, violate the US Constitution's guarantee of substantive due process; 2.) the Executive Orders are illegal under Illinois law, and therefore violate Plaintiffs' rights to procedural due process; 3.) the Executive Orders violate Plaintiffs' rights under the free exercise clause of the First Amendment; and 4.) terminating or suspending employees for refusing to vaccinate violates the Illinois Healthcare Right of Conscience Act, 745 ILCS 70 *et seq.*

4

A. <u>Plaintiffs have a due process right to be free from intrusions into their privacy and bodily autonomy.</u>

Whenever a fundamental right is implicated, the Supreme Court tells us, Courts must apply strict scrutiny in evaluating the constitutionality of the laws at issue. Specifically, the Supreme Court states that the state may only threaten a fundamental right when it is justified by a "compelling state interest," and when the "legislative enactments [are] narrowly drawn to express only the legitimate state interests at stake." <u>Roe v. Wade</u>, 410 U.S. 113, 155 (1973); See also <u>Planned Parenthood of Se. Pennsylvania v. Casey</u>, 505 U.S. 833, 871 (1992). Bodily autonomy, including over medical decisions, is a "significant liberty interest." <u>Washington v. Harper</u>, 495 U.S. 210 (1990). "A competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." in <u>Cruzan v. Director, Missouri Dep't of Health</u>, 497 U.S. 261, 278 (1990). Further, it is beyond doubt that the right to earn a living is a protected right under the Fourteenth Amendment. See <u>Martinez v. Fox Valley Bus Lines</u>, 17 F. Supp. 576, 577 (N.D. Ill. 1936), citing <u>Terrace v. Thompson</u>, 263 U.S. 197 (1923).

True, the Supreme Court, in 1905, ruled that vaccinations can be compelled on threat of a small fine. <u>Jacobson v. Commonwealth of Massachusetts</u>, 197 U.S. 11 (1905). Twenty-two years thereafter, the Supreme Court ruled that individuals could be forcibly sterilized if they were determined to be insane or imbeciles – part of this nation's flirtations with eugenics. <u>Buck v. Bell</u>, 274 US 200 (1927). Some years after that, the Supreme Court found that Japanese Americans could be locked up against their will simply for being Japanese Americans. <u>Korematsu v. United States</u>, 323 US 214 (1944).

The recognition of this history serves more than a rhetorical function: the subordination of the individual right of bodily autonomy to concerns about public health (in whatever forms they come) is part of a bygone era in American jurisprudence. The Supreme Court has, since then, found

that the potential life of an unborn fetus is subordinate to the privacy interest of pregnant women. Roe v. Wade, 410 U.S. 113 (1973). The Court did not shy away from recognizing the competing understandings of the risk that allowing an abortion to occur would constitute the termination of a human life. Rather, it found that

> We need not resolve the difficult question of when life begins. When those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer. *Id.* at 159.

In other words, the risk notwithstanding, some liberty interests, including the right of privacy and the right of bodily autonomy, trump a concern about the possible loss of life. This holding was affirmed and expanded upon in Planned Parenthood of Se. Pennsylvania v. Casey, 505 U.S. 833, 857 & 871 (1992). As the Court stated, there is no simple formula for determining which rights are fundamental and therefore deserving of strict protection. Rather, the development of such rights are part of a "rational process." *Id.* at 850, citing Poe v. Ullman, 367 U.S. 497, 543 (1961)(dissent). *Id.* "Our precedents 'have respected the private realm of family life which the state cannot enter.'" *Id.* at 851.

Important in this analysis is the recognition that the Court has never found that the state, or, indeed, a society, has no interest in regulating such private matters. To the contrary, abortion:

> is an act fraught with consequences for others: for the woman who must live with the implications of her decision; for the persons who perform and assist in the procedure; for the spouse, family, and society which must confront the knowledge that these procedures exist, procedures some deem nothing short of an act of violence against innocent human life; and, depending on one's beliefs, for the life or potential life that is aborted. *Id.*

Rather, the Court has found that *despite these interests*, the government may not so invade a person's privacy. *Id.* That privacy is a fundamental right.

The rejoinder is, by now, well known: in this case, a person's interest in their privacy may impact another person's, and, indeed, society's right to be free from life-threatening viruses. But if it truly was that straightforward, some simple questions demand answers: why did the State of Illinois or the City of Chicago not require testing of employees for COVID-19 at any time prior to the imposition of the vaccine mandates? Why did this state witness several large spikes in cases and deaths due to COVID-19 with not a hint of any such requirement, only to see it put in place at the tail end of a relatively smaller spike in cases? Plaintiffs here have been interacting with the public – some have been the front line in the protection of public health during this pandemic – for the last eighteen months. They have been more exposed to COVID-19 than society at large. They have risked infection, and in many cases have become infected with COVID-19 as a result. They have done so without ever being told that they needed to submit to regular tests. It cannot seriously be maintained, at this late stage, that weekly COVID-19 tests are integral to the health of those fortunate enough to be rescued by Plaintiffs or their fellow employees, or those with whom they interact.

Further, the testing requirements ignore the reality on the ground: those with natural immunity are better protected than those with vaccine immunity. Yet the mandates do not require those with vaccine immunity (with or without natural immunity) to test weekly. This suggests two things: a.) the mandate discriminates arbitrarily against those with only natural immunity in favor of those with only vaccine immunity; and b.) the mandate is, itself, arbitrary. The compelling societal interest being ostensibly promoted should not be vaccination in and of itself. It should be public health; but if the Governor were promoting public health, the Executive Order would not ignore the fact of natural immunity in favor of compelling vaccinations for their own sake. Furthermore, the

percentage of the population that is immune is not correlated with success in fighting transmission of new COVID-19 cases.[4]

The other obvious rejoinder to Plaintiffs is that vaccine mandates of some kind or another have long-existed, and are largely uncontroversial. See, for example, Klaassen v. Trustees of Indiana University, 2021 WL 3073926, 24 (N.D. Indiana, 2021). However, there is a difference between the COVID-19 vaccinations and vaccinations for long extant viruses of the kind typically vaccinated against by students in elementary school. The COVID-19 vaccines are, like COVID-19, extremely novel. As Dr. Kathleen Mullane explains, regarding the Pfizer and Moderna vaccines (in a video created for the purpose of promoting widespread comfort and acceptance with life-saving COVID-19 vaccinations), the COVID-19 vaccines are "the first messenger RNA [elsewhere, mRNA] vaccines to be approved for widespread use in the US.[5]"

With each news cycle, Americans learn new things about these vaccines. One of the things we have recently learned about the COVID-19 vaccines is that they are far less effective than originally advertised[6]. They are also not without risks, as Klaassen points out. Id. at 10 ("Many recipients experience mild local and systemic reactions, including fever, headache, muscle pain, chills, and tiredness. In very rare cases, more serious side effects seem to emerge such as allergic reactions or blood clots with low platelets. For young men specifically, experts are studying a temporal correlation between vaccines and myocarditis, an inflammation of the heart muscle, or pericarditis, inflammation of tissue around the heart")(citations omitted). Some medical doctors have cautioned the public regarding the risks associated with vaccination. Dr. Joseph Lapado, with

---

[4] Subramanian, S.V., Kumar, A. Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States. Eur J Epidemiol (2021). https://doi.org/10.1007/s10654-021-00808-7
[5] https://www.uchicagomedicine.org/forefront/coronavirus-disease-covid-19/what-is-an-mrna-vaccine at 0.25.
[6] See, for example, https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf, quoted in the Complaint.

the UCLA Geffen School of Medicine, and Dr. Harvey Risch, with the Yale School of Public Health, noted that "[t]he large clustering of certain adverse events immediately after vaccination is concerning, and the silence around these potential signals of harm reflects the politics surrounding Covid-19 vaccines. Stigmatizing such concerns is bad for scientific integrity and could harm patients.[7]" There have also been several noted cases of otherwise healthy people dying, or suffering severe episodes, immediately after taking COVID-19 vaccines[8].

      The question of the constitutionality of the mandate does not merely involve the question of whether an individual can be compelled to violate his privacy, or his conscience in the interest of public health; it also involves the question of whether an individual can be compelled to subject himself to risk of illness or death (however remote that may be – and the jury is out on that question) in the interest of public health. Add to that mix the increasing realization that the vaccines are not the panacea they were originally thought to be, and the issue of prior precedent in favor of mandating the vaccination of students with long-tested vaccines adds little to the analysis here.

---

[7] https://townhall.com/tipsheet/katiepavlich/2021/06/24/doctors-from-yale-and-ucla-there-are-concerns-about-the-vaccine-officials-may-not-be-telling-you-about-n2591466, and https://www.wsj.com/articles/are-covid-vaccines-riskier-than-advertised-11624381749?st=xanwe361hampa5l&reflink=article_imessage_share. They continue:

> Four serious adverse events follow this arc, according to data taken directly from Vaers: low platelets (thrombocytopenia); noninfectious myocarditis, or heart inflammation, especially for those under 30; deep-vein thrombosis; and death. Vaers records 321 cases of myocarditis within five days of receiving a vaccination, falling to almost zero by 10 days. Prior research has shown that only a fraction of adverse events are reported, so the true number of cases is almost certainly higher. This tendency of underreporting is consistent with our clinical experience. […] Analyses to confirm or dismiss these findings should be performed using large data sets of health-insurance companies and healthcare organizations. The CDC and FDA are surely aware of these data patterns, yet neither agency has acknowledged the trend...the implication is that the risks of a Covid-19 vaccine may outweigh the benefits for certain low-risk populations, such as children, young adults and people who have recovered from Covid-19. This is especially true in regions with low levels of community spread, since the likelihood of illness depends on exposure risk.

[8] See, for example, https://www.foxnews.com/media/covid-vaccine-heart-condition-17-year-old-father-friends, https://www.thecollegefix.com/northwestern-student-appears-to-have-died-from-heart-inflammation-linked-to-covid-vaccine/, https://www.mercurynews.com/2021/06/25/teen-boy-dies-a-few-days-after-receiving-second-covid-vaccine-shot/, and https://www.nbcconnecticut.com/news/coronavirus/covid-vaccine-mom-of-conn-teen-speaks-after-son-suffers-heart-condition-days-after-covid-19-vaccine/2495057/,

Even under the more deferential rational basis test, the Executive Order and the City Mandate are unconstitutional. "Under rational basis review, a state law is constitutional even if it is unwise, improvident, or out of harmony with a particular school of thought. The law must merely bear a rational relationship to some legitimate end." Goodpaster v. City of Indianapolis, 736 F.3d 1060, 1071 (7th Cir. 2013). Yet again here, the legitimate end is public health, not public vaccination. If the mandates were rationally related to the promotion of *public health*, those who have been vaccinated but who do not have natural immunity would not be exempt from the weekly-testing requirement, given that their immunity is inferior to that of those who have natural immunity but have not been vaccinated. Meanwhile, those who do not have the vaccines but do have natural immunity would be exempt. Further, even assuming that there is some public policy objective advanced through voluntary vaccination, no public policy objective is advanced by the punitive disclosure requirement imposed by the City of Chicago. The mandates are punitive as opposed to ameliorative.

B. The Governor exceeded his authority under Illinois law in enacting Executive Order 2021-22.

The Governor has no power to unilaterally require Plaintiffs to vaccinate, or to submit to medical testing, on penalty of losing their livelihood. The last eighteen months of successive Executive Orders have been premised on the Illinois Emergency Management Act, 20 ILCS 3305. See Cassell v. Snyders, 458 F.Supp.3d 981 (Ill. N.D., 2020). There is no component of that law that gives the governor the power, absent any specific legislative guidance, to enact the broad and sweeping enactments that comprise Executive Order 2021-22. The Governor's power under the Act is not "without restraint." *Id.* at 1002. "Should this or any future Governor abuse his or her authority by issuing emergency declarations after a disaster subsides, affected parties will be able to challenge the sufficiency of those declarations in court." *Id.*

Similarly, the Cook County President unilaterally issued the Executive Order at issue here. That order cites the Governor's Executive Order as the basis for its exercise of emergency powers.

"[P]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." Mathews v. Eldridge, 424 U.S. 319, 332 (1976). Regardless of the substantive due process right that these Plaintiffs have to their privacy and their autonomy, they also have a right not to be denied the same absent the proper process. The Governor's power is not unlimited. The legislature has remained silent on the subject of vaccine mandates. Executive Order 2021-22 was, therefore, a massive overreach. It violates Plaintiffs' rights under the US Constitution and under Illinois law.

The same is true about the City of Chicago. The Mayor's office unilaterally announced the vaccine mandate without the approval of the City Council, which has remained silent. The mandate fundamentally changes the nature of Plaintiffs' contracts with their employer, the City of Chicago. Further, Plaintiffs are not being permitted to grieve their suspension before being summarily suspended without pay. The City mandates therefore violate procedural due process as well.

C.  Plaintiffs' have a likelihood of success based upon the Free Exercise Clause.

The First Amendment prohibits a state or municipality from "prohibiting the free exercise" of religion. "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions," triggers strict scrutiny under the Free Exercise Clause. Trinity Lutheran Church of Colombia Inc. v. Comer, 137 S.Ct. 2012, 2022 (2017), cited by Dahl v. Board of Trustees of Western Michigan Univ., ____ F.4th ____ (6 Cir., 2021)("finding that the vaccine mandate employed by Western Michigan University violated the Free Exercise clause when requests for religious accommodations were rejected."). "A policy that forces a person to choose between observing her religious beliefs and receiving a generally available government benefit for which she is otherwise

11

qualified burdens her free exercise rights." <u>Dahl</u>, citing <u>Fulton v. City of Phila.</u>, 141 S. Ct. 1868, 1867 (2021), and <u>Trinity Luterhan</u>, 137 S.Ct. at 2023. "The reason is simple: denying a person "an equal share of the rights, benefits, and privileges enjoyed by other citizens because of her faith discourages religious activity." <u>Dahl</u>, citing <u>Lying v. Nw. Indian Cemetery Protective Ass'n</u>, 485 U.S., 439, 449 (1988).

A policy that "extends discretionary exemptions to a policy… must grant exemptions for cases of 'religious hardship' or present compelling reasons not to." <u>Dahl</u>, citing <u>Fulton</u>, 141 S.Ct. at 1877. This is true despite <u>Employment Division v. Smith</u>, 494 U.S. 872 (1990). In <u>Dahl</u>, the Sixth Circuit Court of Appeals found that a university's vaccine mandate (which is nearly identical in application to Cook County's) violated the Free Exercise clause by providing a mechanism for individualized exemption, but not exempting those with deeply held religious beliefs against taking t he COVID-19 vaccine. In doing so, it cited both <u>Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah</u>, 508 U.S. 520, 456 (1993) and <u>Roman Cath. Diocese of Brooklyn v. Cuomo</u>, 141 S. Ct. 63 (2020). <u>Cuomo</u> is particularly instructive in that in that decision, the Supreme Court found that exempting certain businesses from lockdowns while still requiring religious institutions to lock down violated the Free Exercise clause because the latter were "comparable" for the purposes of spreading Covid. <u>Id</u>. at 66. Here too, if religious exemptions are not being approved while other comparable exemptions are being approved, the First Amendment has been violated.

It is also improper to seek, among other things, the signature of a religious leader. In the context of EEO complaints, which have elements in common to the Free Exercise count here, the deeply held belief at issue in a request for an accommodation need not even be correct according to the majority of (or even any) religious leaders and practitioners of the religion. See <u>Davis v. Fort Bend County</u>, 765 F.3d 480 (5th Cir., 2014). "Testimony… describing this motivation in terms meeting the broad standard for what is religious will usually suffice." <u>Id</u>. "For example, if one were

to testify that he believes the goddess Bastet commanded him to eat cat food in worship of her divinity, and he sincerely holds that belief, he has provided sufficient evidence of a bona fide religious belief." *Id.* "This is so even if Bastet did not in fact give that command and the record reflects that this is not a generally recognized tenet of Bastet worship." *Id.* Therefore

        D.   The Illinois Health Care Right of Conscience Act prohibits discriminating against Plaintiffs on the basis of their vaccination status.

Illinois statute prohibits discrimination on the basis of vaccination status. Specifically, it prohibits discrimination generally, and in employment specifically, on the basis of any person's "conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care services contrary to his or her conscience." 745 ILCS 70/5 and 740 ILCS 70/7. Courts applying Illinois law have upheld the Act in finding that employees could not be terminated for their deeply held beliefs concerning health matters. Vandersand v. Wal-Mart Stores, Inc., 525 F.Supp.2d 1052 (C.D. Ill, 2017), Rojas v. Martell, 2020 IL App (2d) 190215.

The threatened suspension and subsequent termination here is squarely a violation of the Act. Plaintiffs have refused to vaccinate on the basis of their deeply held beliefs. They are being discriminated against, illegally, on that basis.

    **II.**    **Plaintiffs will suffer irreparable harm if Defendants are not enjoined.**

The matter of irreparable harm is somewhat simpler. The Seventh Circuit has found that violations of individuals' constitutional rights constitute irreparable harm as a matter of law. Joelner v. Village of Washington Park, Illinois, 378 F.3d 613, 620 (7th Cir., 2004); see Klaassen v. Trustees of Indiana University, 2021 WL 3073926, 41 (N.D. Indiana, 2021), applying the same analysis to vaccine mandates in the context of students at a university.

In this case, Plaintiffs have been given an unconstitutional and illegal ultimatum: violate their deeply held beliefs or be suspended and then terminated. They will suffer irreparable harm as a matter of law if this Court does not intervene.

### III.  The Balancing of Equities, and the Public Interest Favors Plaintiffs.

"The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." Turnell v. CentiMark Corp., 796 F.3d 656, 662 (7th Cir.2015). The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." Stuller, Inc. v. Steak N Shake Enterprises, Inc., 695 F.3d 676, 678 (7th Cir.2012). "Stated another way, the district court 'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken." Id. "This weighing process, as noted, also takes into consideration the consequences to the public interest of granting or denying preliminary relief." Abbott Lab'ys v. Mead Johnson & Co., 971 F.2d 6, 12 (7th Cir. 1992).

The balancing of the equities favors Plaintiffs for the reasons addressed above. There is a likelihood of success on the merits. The public interest is best upheld through fidelity to the rule of law and the Constitution, and Illinois statute. The vaccines pose potential harms to Plaintiffs. To the claim that the vaccine mandate may save lives – the more we learn about them, the less certain that is. Plaintiffs have been functioning in their roles, having significant interactions with the community around them, for the last eighteen months. There has been no showing, either in the factual recitations of the Executive Orders, or in the findings of any of the other Defendants, that Plaintiffs pose a risk to their surroundings. To the contrary, they are a credit to the institutions of mental and physical health and wellbeing in the State of Illinois. To now scapegoat them by implying that absent

some top-down mandate impacting their fundamental rights that they pose a risk to the community they heroically serve is a disservice to them and the people of this State.

Finally, since the Executive Order is illegal under the Illinois Emergency Management Act, and since the legislature has had ample opportunity to act (and continues to be able to do so), were the Court to determine that the most successful prong of this attack is the procedural prong, it would not be denying the State the opportunity to write and pass whatever legislation is necessary to protect the populace. This state has existed far too long in a state of executive fiat. The long-term impact of that power grab may be at least as far reaching as the long-term impact of the pandemic, and may well exceed it.

### Conclusion

Plaintiffs have made a showing that they are entitled to a Temporary Restraining Order and a Preliminary Injunction. While the pandemic is, indeed, a frightening affair – many if not all of the people in this country have lived in understandable fear for the greater part of the last eighteen months – it should not be an excuse to turn the procedural and substantive rights of the people of this state on their heads. Plaintiffs are entitled to an injunction as a matter of law and fact.

WHEREFORE, Plaintiffs request that this Honorable Court enter a Temporary Restraining Order and a Preliminary Injunction enjoining Defendants from enforcing Executive Order 2021-22, the corresponding Cook County Order, and from suspending or terminating Plaintiffs for the duration of this lawsuit.

Respectfully Submitted,

s/Jonathan Lubin
Attorney for Plaintiff

Jonathan Lubin
8800 Bronx Ave. - Suite 100H          773 954 2608
Skokie, IL 60077                      jonathan@lubinlegal.com

Exhibit A



**STATE OF ILLINOIS**

**EXECUTIVE DEPARTMENT**

**SPRINGFIELD, ILLINOIS**

**FILED**
INDEX DEPARTMENT

SEP 0 3 2021

IN THE OFFICE OF
**SECRETARY OF STATE**

September 3, 2021                                    Executive Order 2021-22

### EXECUTIVE ORDER 2021-22
### (COVID-19 EXECUTIVE ORDER NO. 88)

**WHEREAS**, since early March 2020, Illinois has faced a pandemic that has caused extraordinary sickness and loss of life, infecting over 1,538,300, and taking the lives of more than 24,000 residents; and,

**WHEREAS**, at all times but especially during a public health crisis, protecting the health and safety of Illinoisans is among the most important functions of State government; and,

**WHEREAS**, the Illinois Department of Public Health (IDPH) has determined that the Delta variant is the most dominant strain of COVID-19 in Illinois and has spread quickly among unvaccinated people of all ages in Illinois; and,

**WHEREAS**, the Delta variant is more aggressive and more transmissible than previously circulating strains, and poses significant new risks in the ongoing effort to stop and slow spread of the virus; and,

**WHEREAS**, the Delta variant also may cause more severe disease than prior strains of the virus; and,

**WHEREAS**, the Centers for Disease Control and Prevention (CDC) estimates that the Delta variant now accounts for more than 90 percent of all sequenced coronavirus cases in the U.S.; and,

**WHEREAS**, the CDC has issued guidance recommending wearing a mask indoors in public in most circumstances, even for fully vaccinated people,[1] as well as where required by federal, state, local, tribal, or territorial laws, rules, and regulations, including local business and workplace guidance; and,

**WHEREAS**, every region in the State is experiencing increased numbers of COVID-19 cases and increased numbers of hospital beds and ICU beds utilized by COVID-19 patients; and,

**WHEREAS**, there are parts of the country in which there are few if any available ICU beds as a result of the Delta variant, and in many parts of Illinois, the number of available ICU beds has been decreasing in recent weeks as a result of the Delta variant; and,

**WHEREAS**, the CDC continues to advise that cloth face coverings or masks protect persons who are not fully vaccinated from COVID-19; and,

---

[1] Individuals are considered fully vaccinated 2 weeks after their second dose in a 2-dose series, such as the Pfizer-BioNTech or Moderna vaccines, or 2 weeks after a single-dose vaccine, such as Johnson & Johnson's Janssen vaccine. Individuals who do not meet these requirements, regardless of age, are not considered fully vaccinated.

1

**WHEREAS**, social distancing, face coverings, and other public health precautions have proved to be critical in slowing and stopping the spread of COVID-19; and,

**WHEREAS**, COVID-19 cases for 5 to 11-year-olds and 12 to 17-year-olds went up dramatically over the past month; and,

**WHEREAS**, the CDC has recognized vaccination as the leading public health prevention strategy to end the COVID-19 pandemic and recommends that all teachers, staff, and eligible students be vaccinated as soon as possible; and,

**WHEREAS**, COVID-19 vaccines are safe, effective, and widely available free of cost to any Illinois resident 12 years of age and older; and,

**WHEREAS**, while over 6.7 million Illinoisans have been fully vaccinated against COVID-19, in order to protect against the rapid spread of the Delta variant, additional steps are necessary to ensure that the number of vaccinated residents continues to increase and includes individuals working in certain settings of concern, including those who work around children under the age of 12; and,

**WHEREAS**, increasing vaccination rates in schools is the strongest protective measure against COVID-19 available and, together with masking and regular testing, is vital to providing in-person instruction in as safe a manner as possible; and,

**WHEREAS**, health care workers, and particularly those involved in direct patient care, face an increased risk of exposure to COVID-19; and,

**WHEREAS**, stopping the spread of COVID-19 in health care settings is critically important because of the presence of people with underlying conditions or compromised immune systems; and,

**WHEREAS**, requiring individuals in health care settings to receive a COVID-19 vaccine or undergo regular testing can help prevent outbreaks and reduce transmission to vulnerable individuals who may be at a higher risk of severe disease; and,

**WHEREAS**, statewide measures are necessary to protect particularly vulnerable individuals, as well as employees, in high-risk health care settings; and,

**WHEREAS**, it is the duty of every employer to protect the health and safety of employees by establishing and maintaining a healthy and safe work environment and requiring employees to comply with health and safety measures; and,

**WHEREAS**, in light of the continued spread of COVID-19, the increasing threat of the Delta variant, and the significant percentage of the population that remains unvaccinated, I declared on August 20, 2021 that the current circumstances in Illinois surrounding the spread of COVID-19 continue to constitute an epidemic emergency and a public health emergency under Section 4 of the Illinois Emergency Management Agency Act;

**THEREFORE**, by the powers vested in me as the Governor of the State of Illinois, pursuant to the Illinois Constitution and the Illinois Emergency Management Agency Act, 20 ILCS 3305, Sections 7(1), 7(2), 7(3), 7(8), 7(12), and Section 19 thereof, and consistent with the powers in public health laws, I hereby order the following effective immediately:

**Section 1: Face covering requirements for individuals.** Beginning on Monday, August 30, 2021, all individuals in Illinois who are age two or over and able to medically tolerate a face covering (a mask or cloth face covering) shall be required to cover their nose and mouth with a face covering when in an indoor public place. All employers must ensure that employees wear face coverings in indoor workplaces. Illinoisans should also consider wearing a mask in crowded outdoor settings and for activities that involve close contact with others who are not fully vaccinated.

Face coverings may be removed temporarily while actively eating or drinking (including in bars or restaurants), and may be removed by employees at workplaces when they can consistently maintain six feet of distance (such as when employees are in their office or cubicle space).

All individuals, including those who are fully vaccinated, shall continue to be required to wear a face covering (1) on planes, buses, trains, and other forms of public transportation and in transportation hubs such as airports and train and bus stations; (2) in congregate facilities such as correctional facilities and homeless shelters; and (3) in healthcare settings.

**Section 2: Vaccination and Testing Requirements for Health Care Workers.**
- a. Definitions
    - i. "Health Care Worker" means any person who (1) is employed by, volunteers for, or is contracted to provide services for a Health Care Facility, or is employed by an entity that is contracted to provide services to a Health Care Facility, and (2) is in close contact (fewer than 6 feet) with other persons in the facility for more than 15 minutes at least once a week on a regular basis as determined by the Health Care Facility. The term "Health Care Worker" does not include any person who is employed by, volunteers for, or is contracted to provide services for any State-owned or operated facility. The term "Health Care Worker" also does not include any person who is present at the Health Care Facility for only a short period of time and whose moments of close physical proximity to others on site are fleeting (e.g., contractors making deliveries to a site where they remain physically distanced from others or briefly entering a site to pick up a shipment).
    - ii. "Health Care Facility" means any institution, building, or agency, or portion of an institution, building or agency, whether public or private (for-profit or nonprofit), that is used, operated or designed to provide health services, medical treatment or nursing, or rehabilitative or preventive care to any person or persons. This includes, but is not limited to, ambulatory surgical treatment centers, hospices, hospitals, physician offices, pharmacies, emergency medical services, IDPH licensed emergency medical service vehicles, chiropractic offices, dental offices, free-standing emergency centers, urgent care facilities, birth centers, post-surgical recovery care facilities, end-stage renal disease facilities, long-term care facilities (including skilled and intermediate long-term care facilities licensed under the Nursing Home Care Act, the ID/DD Community Care Act or the MC/DD Act), Specialized Mental Health Rehabilitation Facilities, assisted living facilities, supportive living facilities, medical assistance facilities, mental health centers, outpatient facilities, public health centers, rehabilitation facilities, residential treatment facilities, and adult day care centers. The term "Health Care Facility" does not include any State-owned or operated facilities.
    - iii. An individual is "fully vaccinated against COVID-19" two weeks after receiving the second dose in a two-dose series of a COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the U.S. Food and Drug Administration (FDA), or two weeks after receiving a single-dose COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA.
- b. All Health Care Workers must have, at a minimum, the first dose of a two-dose COVID-19 vaccine series or a single-dose COVID-19 vaccine by September 19, 2021, and the second dose of a two-dose COVID-19 vaccine series within 30 days following administration of their first dose in a two-dose vaccination series. Any Health Care Workers who have not established that they are fully vaccinated against COVID-19 must be tested consistent with the requirements of Subsection (d). To establish that they are fully vaccinated against COVID-19, Health Care Workers must provide proof of full vaccination against COVID-19 to the Health

Care Facility. Proof of COVID-19 vaccination may be met by providing one of the following: (1) a CDC COVID-19 vaccination record card or photograph of the card; (2) documentation of vaccination from a health care provider or electronic health record; or (3) state immunization records.

c. Health Care Facilities shall exclude Health Care Workers who are not fully vaccinated against COVID-19 from the premises unless they comply with the testing requirements specified in Subsection (d).

d. Beginning September 19, 2021, to enter or work at or for a Health Care Facility, Health Care Workers who have not been fully vaccinated against COVID-19 must undergo testing for COVID-19, as described below, until they establish that they are fully vaccinated against COVID-19:

    i. Health Care Workers who are not fully vaccinated against COVID-19 must be tested for COVID-19 weekly, at a minimum. The testing must be done using a test that either has Emergency Use Authorization by the FDA or be operating per the Laboratory Developed Test requirements by the U.S. Centers for Medicare and Medicaid Services.

    ii. Such testing for Health Care Workers who are not fully vaccinated against COVID-19 must be conducted on-site at the Health Care Facility or the Health Care Facility must obtain proof or confirmation from the Health Care Worker of a negative test result obtained elsewhere.

    iii. IDPH recommends that Health Care Workers be tested using a PCR test if available.

e. Individuals are exempt from any requirement to be fully vaccinated against COVID-19 if (1) vaccination is medically contraindicated, including any individual who is entitled to an accommodation under the Americans with Disabilities Act or any other law applicable to a disability-related reasonable accommodation, or (2) vaccination would require the individual to violate or forgo a sincerely held religious belief, practice, or observance. Individuals who demonstrate they are exempt from the vaccination requirement shall undergo, at a minimum, weekly testing as provided for in Subsection (d).

f. State agencies, including but not limited to IDPH, the Illinois Department of Human Services, and the Illinois Department of Healthcare and Family Services, may promulgate emergency rules as necessary to effectuate this Executive Order.

**Section 3: Vaccination and Testing Requirements for School Personnel.**

a. Definitions

    i. "School Personnel" means any person who (1) is employed by, volunteers for, or is contracted to provide services for a School or school district serving students in pre-kindergarten through 12th grade, or who is employed by an entity that is contracted to provide services to a School, school district, or students of a School, and (2) is in close contact (fewer than 6 feet) with students of the School or other School Personnel for more than 15 minutes at least once a week on a regular basis as determined by the School. The term "School Personnel" does not include any person who is present at the School for only a short period of time and whose moments of close physical proximity to others on site are fleeting (e.g., contractors making deliveries to a site where they remain physically distanced from others or briefly entering a site to pick up a shipment).

    ii. "School" means any public or nonpublic elementary or secondary school, including charter schools, serving students in pre-kindergarten through 12th grade, including any State-operated residential schools such as the Philip J. Rock Center and School, the Illinois School for the Visually Impaired, the Illinois School for the Deaf, and the Illinois Mathematics and Science Academy. The term "School" does not include the Illinois Department of Juvenile Justice.

    iii. An individual is "fully vaccinated against COVID-19" two weeks after receiving the second dose in a two-dose series of a COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the

4

UFDA, or two weeks after receiving a single-dose COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA.

b. All School Personnel must have, at a minimum, the first dose of a two-dose COVID-19 vaccine series or a single-dose COVID-19 vaccine by September 19, 2021, and the second dose of a two-dose COVID-19 vaccine series within 30 days following administration of their first dose in a two-dose vaccination series. Any School Personnel who have not established that they are fully vaccinated against COVID-19 must be tested consistent with the requirements of Subsection (d). To establish that they are fully vaccinated against COVID-19, School Personnel must provide proof of full vaccination against COVID-19 to the School. Proof of COVID-19 vaccination may be met by providing one of the following: (1) a CDC COVID-19 vaccination record card or photograph of the card; (2) documentation of vaccination from a health care provider or electronic health record; or (3) state immunization records.

c. Schools shall exclude School Personnel who are not fully vaccinated against COVID-19 from the premises unless they comply with the testing requirements specified in Subsection (d).

d. Beginning September 19, 2021, to enter or work at or for a School, School Personnel who have not been fully vaccinated against COVID-19 must undergo testing for COVID-19, as described below, until they establish that they are fully vaccinated against COVID-19:

   i. School Personnel who are not fully vaccinated against COVID-19 must be tested for COVID-19 weekly, at a minimum. The testing must be done using a test that either has Emergency Use Authorization by the FDA or be operating per the Laboratory Developed Test requirements by the U.S. Centers for Medicare and Medicaid Services.

   ii. Such testing for School Personnel who are not fully vaccinated against COVID-19 must be conducted on-site at the School or the School must obtain proof or confirmation from the School Personnel of a negative test result obtained elsewhere.

   iii. IDPH recommends that School Personnel be tested using a PCR test if available.

e. Individuals are exempt from any requirement to be fully vaccinated against COVID-19 if (1) vaccination is medically contraindicated, including any individual who is entitled to an accommodation under the Americans with Disabilities Act or any other law applicable to a disability-related reasonable accommodation, or (2) vaccination would require the individual to violate or forgo a sincerely held religious belief, practice, or observance. Individuals who demonstrate they are exempt from the vaccination requirement shall undergo, at a minimum, weekly testing as provided for in Subsection (d).

f. State agencies, including but not limited to IDPH and the Illinois State Board of Education, may promulgate emergency rules as necessary to effectuate this Executive Order.

**Section 4: Vaccination and Testing Requirements for Higher Education.**

a. Definitions

   i. "Higher Education Personnel" means any person who (1) is employed by, volunteers for, or is contracted to provide services for an Institution of Higher Education, or is employed by an entity contracted to provide services for an Institution of Higher Education, and (2) is in close contact (fewer than 6 feet) with other persons on the campus or in a campus-affiliated building or location for more than 15 minutes at least once a week on a regular basis. The term "Higher Education Personnel" does not include any person who is present on the campus or at an affiliated off-campus location for only a short period of time and whose moments of close physical proximity to others on site are fleeting (e.g.,

contractors making deliveries to a site where they remain physically distanced from others or briefly enter a site to pick up a shipment).

    ii. "Institution of Higher Education" means any publicly or privately operated university, college, community college, junior college, business, technical or vocational school, or other educational institution offering degrees, programs, or instruction beyond the secondary school level.

    iii. "Higher Education Student" means an individual enrolled in credit-bearing or non-credit bearing coursework at an Institution of Higher Education, either on campus or at an affiliated off-campus location. The term "Higher Education Student" does not include individuals who complete their coursework exclusively remotely.

    iv. An individual is "fully vaccinated against COVID-19" two weeks after receiving the second dose in a two-dose series of a COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA, or two weeks after receiving a single-dose COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA.

b. All Higher Education Personnel and Higher Education Students must have, at a minimum, the first dose of a two-dose COVID-19 vaccine series or a single-dose COVID-19 vaccine by September 19, 2021, and the second dose of a two-dose COVID-19 vaccine series within 30 days following administration of their first dose in a two-dose vaccination series. Any Higher Education Personnel or Higher Education Students who have not established that they are fully vaccinated against COVID-19 must be tested consistent with the requirements of Subsection (d). To establish that they are fully vaccinated against COVID-19, Higher Education Personnel and Higher Education Students must provide proof of full vaccination against COVID-19 to the Institution of Higher Education. Proof of COVID-19 vaccination may be met by providing one of the following: (1) a CDC COVID-19 vaccination record card or photograph of the card; (2) documentation of vaccination from a health care provider or electronic health record; or (3) state immunization records.

c. An Institution of Higher Education shall exclude Higher Education Personnel and Higher Education Students who are not fully vaccinated against COVID-19 from the premises unless they comply with the testing requirements specified in Subsection (d).

d. Beginning September 19, 2021, to enter or work at or for an Institution of Higher Education, Higher Education Personnel and Higher Education Students who have not been fully vaccinated against COVID-19 must undergo testing for COVID-19, as described below, until they establish that they are fully vaccinated against COVID-19:

    i. Higher Education Personnel and Higher Education Students who are not fully vaccinated against COVID-19 must be tested for COVID-19 weekly, at a minimum. Testing must be done using a test that either has Emergency Use Authorization by the FDA or be operating per the Laboratory Developed Test requirements by the U.S. Centers for Medicare and Medicaid Services.

    ii. Such testing for Higher Education Personnel and Higher Education Students who are not fully vaccinated against COVID-19 must be conducted on-site at the Institution of Higher Education or the Institution of Higher Education must obtain proof or confirmation from the Higher Education Personnel or Higher Education Student who is not fully vaccinated against COVID-19 of a negative test result obtained elsewhere.

    iii. IDPH recommends that Higher Education Personnel and Higher Education Students be tested using PCR tests if available.

e. Individuals are exempt from any requirement to be fully vaccinated against COVID-19 if (1) vaccination is medically contraindicated, including any

6

       individual who is entitled to an accommodation under the Americans with Disabilities Act or any other law applicable to a disability-related reasonable accommodation, or (2) vaccination would require the individual to violate or forgo a sincerely held religious belief, practice, or observance. Individuals who demonstrate they are exempt from the vaccination requirement shall undergo, at a minimum, weekly testing as provided for in Subsection (d).

    f. State agencies, including but not limited to IDPH, the Illinois Community College Board, and the Illinois Board of Higher Education, may promulgate emergency rules as necessary to effectuate this Executive Order.

## Section 5: Vaccination Requirements at State-Owned or Operated Congregate Facilities.

    a. Definitions

        i. "State-owned or operated congregate facilities" means congregate facilities operated by the Illinois Department of Veterans' Affairs, the Illinois Department of Human Services, the Illinois Department of Corrections, and the Illinois Department of Juvenile Justice.

        ii. An individual is "fully vaccinated against COVID-19" two weeks after receiving the second dose in a two-dose series of a COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the U.S. FDA, or two weeks after receiving a single-dose COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA.

    b. All State employees at State-owned or operated congregate facilities must have both doses of a two-dose COVID-19 vaccine series or a single-dose COVID-19 vaccine by no later than October 4, 2021, subject to bargaining.

    c. All contractors and vendors who work at State-owned or operated congregate facilities must have both doses of a two-dose COVID-19 vaccine series or a single-dose COVID-19 vaccine by no later than October 4, 2021. This does not include any person who is present at a State-owned or operated congregate facility for only a short period of time and whose moments of close physical proximity to others on site are fleeting, as determined by the facility (e.g., contractors making deliveries to a site where they remain physically distanced from others or briefly enter a site to pick up a shipment).

    d. To meet the requirement to be fully vaccinated against COVID-19, State employees and contractors and vendors at State-owned or operated congregate facilities must provide proof of full vaccination against COVID-19 to the State-owned or operated congregate facility. Proof of COVID-19 vaccination may be met by providing one of the following: (1) a CDC COVID-19 vaccination record card or photograph of the card; (2) documentation of vaccination from a health care provider or electronic health record; or (3) state immunization records.

    e. Individuals will be exempt from the requirement to be fully vaccinated against COVID-19 if (1) vaccination is medically contraindicated, including any individual who is entitled to an accommodation under the Americans with Disabilities Act or any other law applicable to a disability-related reasonable accommodation, or (2) vaccination would require the individual to violate or forgo a sincerely held religious belief, practice, or observance. Individuals who demonstrate they meet the requirements for an exemption will be subject to additional testing requirements.

    f. The Illinois Department of Central Management Services Labor Relations team is instructed to negotiate effectuating this Executive Order with the relevant labor unions, and to bargain these provisions as appropriate under the law.

## Section 6: Additional Vaccination and Testing Requirements.

    a. Information about available testing resources, including state-supported community-based testing sites, is available at: http://dph.illinois.gov/testing. Additional information is also available in IDPH's Interim Guidance on Testing for COVID-19 in Community Settings and Schools, available at:

http://dph.illinois.gov/covid19/community-guidance/rapid-point-care-testing-covid-19.

b. Nothing in this Executive Order prohibits any entity, public or private, from implementing vaccination or testing requirements for personnel, contractors, students or visitors that exceed the requirements of this Executive Order, including a requirement to be fully vaccinated by a date sooner than required by this Executive Order.

c. Nothing in this Executive Order prohibits any entity, public or private, from implementing a requirement that personnel, contractors, students or visitors be fully vaccinated without providing the alternative to test on a weekly basis, consistent with applicable law.

d. IDPH and the Illinois State Board of Education may adopt emergency rules to require facilities to conduct more frequent testing than required by this Executive Order, and nothing in this Executive Order is intended to supersede or replace any IDPH protocols for facilities to implement more frequent testing in areas of high transmission or for facilities experiencing an outbreak.

e. All entities are encouraged to implement robust vaccination and testing programs to reduce the spread of COVID-19.

f. Entities may permit Health Care Workers, School Personnel, Higher Education Personnel, and Higher Education Students to be present on premises while they are awaiting the results of a weekly COVID-19 test required by this Executive Order as long as they do not have any symptoms of COVID-19 that warrant exclusion until a test result is received.

**Section 7.** During the duration of the Gubernatorial Disaster Proclamation, the requirement in the Hospital Licensing Act, 210 ILCS 85/10(c) that the Department must receive prior approval from the Hospital Licensing Board before adopting a rule is suspended.

**Section 8: Savings Clause.** If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable.

**Section 9: Prior Executive Orders.** This Executive Order supersedes Executive Order 2021-20 and any contrary provision of any other prior Executive Order. Any provisions that are not contrary to those in this Executive Order shall remain in full force and effect.

**JB Pritzker, Governor**

Issued by the Governor September 3, 2021
Filed by the Secretary of State September 3, 2021

**FILED**
INDEX DEPARTMENT

SEP 0 3 2021

IN THE OFFICE OF
SECRETARY OF STATE

8

Exhibit B

Exhibit B



## City of Chicago
## COVID-19 Vaccine Religious Exemption Request

### Instructions for Employee

**The City of Chicago is committed to providing equal employment opportunities without regard to any protected status and a work environment that is free of unlawful harassment, discrimination, and retaliation. As such, the City is committed to complying with all laws protecting employees' religious beliefs and practices. When requested, the City will provide an exemption from mandated vaccination for employees' religious beliefs and practices which prohibit the employee from receiving a COVID-19 vaccine.**

- To request an exemption from the City of Chicago's Mandatory COVID-19 Vaccination Policy due to a sincerely held religious belief conflicting with any of the currently available COVID-19 vaccines, you must complete this request form.
- The completed request form must be provided to the Department of Human Resources (email address: vaccineexemptions@cityofchicago.org) or your department's Human Resources Liaison in order to allow the City to evaluate your religious exemption request. This information will be used by the Department of Human Resources to engage in an interactive process to determine eligibility.
- Consistent with State and Federal law, exemptions will only be granted for a sincerely held set of moral convictions arising from belief in and relation to religious beliefs.
- Failure or refusal to provide a complete and sufficient request form and/or engage in an interactive process with the Department of Human Resources, if necessary, may impact the City's ability to adequately understand your request or effectively engage in the interactive process which may result in a denial of your exemption request.
- All COVID-19 Vaccine Religious Exemption Requests will be reviewed on a case-by-case basis, taking into account whether the exemption would pose a direct threat to the health and/or safety of you, co-workers, or members of the public during the course of your work duties or cause an undue hardship on the City's operations.
- Requests for exemption and any religious belief information provided will be kept confidential to the extent possible and shared only with those City of Chicago employees who have a need to know.
- Any employee who is found to have engaged in misusing, abusing, and/or engaging in fraudulent activity in requesting, certifying, or taking a religious exemption may be subject to discipline, up to & including termination.

### Instructions for Religious or Spiritual Leader

- The City of Chicago requires that all employees receive the COVID-19 vaccination as a condition of employment. However, a religious exemption from COVID-19 vaccination may be allowed due to an employee's sincerely held religious belief.
- Please review the employee's completed attached certification.
- Please also read and complete Section III at the bottom of the attached certification.
- Be sure to sign the form and provide all requested contact information.
- You may return the completed form to the employee or send it directly to the vaccine exemptions inbox.

**Return Certifications to:**
Department of Human Resources
Email: vaccineexemptions@cityofchicago.org



Exhibit B

**City of Chicago**
**COVID-19 Vaccine Religious Exemption Request**

| **SECTION I:  Employee Information (Please Print or Type)** |
| :-- |

**Employee Name:** _____  **Department:** _____

**Job Title:** _____  **Manager:** _____

**Daytime Phone:** _____  **Religion:** _____

I am requesting a religious exemption from the City of Chicago's Mandatory COVID-19 Vaccination Policy. By signing this form, I certify that the information I have provided is true and accurate to the best of my knowledge.   I understand that deliberately providing false or misleading information in support of my request for religious exemption from the City of Chicago's Mandatory COVID-19 Vaccination Policy or refusing to engage in the interactive process with the Department of Human Resources regarding the applied for exemption under the Vaccination Policy may result in disciplinary action, up to and including termination, under the City's Personnel Rules.

I further understand that in some cases, the City will need to obtain additional information and/or documentation about my religious practice(s) or belief(s) or may need to discuss the nature of my religious belief(s), practice(s) and accommodation with my religion's spiritual leader (if applicable) or religious scholars, to address my request for an exemption.

**Employee Signature:** _____  **Date:** _____

| **SECTION II: Exemption Information** |
| :-- |

**Please state your reason for requesting a religious exemption to the COVID-19 vaccine requirement.**



Exhibit B

## City of Chicago
## COVID-19 Vaccine Religious Exemption Request

**What is the principle of your religious beliefs that conflicts with taking the COVID-19 vaccine?** In your response to this question, please include a description of the specific way that your religious beliefs prevent you from being vaccinated.

**When did you begin practicing this religion or following these beliefs?**

**Do your religious beliefs include objections to other vaccines or medications?** If so, please explain.

| Employee Signature: | Date *(MM/DD/YYYY)*: |
|---|---|

## SECTION III: Religious or Spiritual Leader – Complete this section

**Affirmation of belief**: *I have met with and provided religious or spiritual counsel to the above employee regarding their sincerely held religious beliefs and practices. I affirm that this employee is a member of our religious organization. I further affirm that these beliefs regarding any immunization or immunizing agent are in line with the tenets of our religious or spiritual faith, teachings, and/or practices.*

Date *(MM/DD/YYYY)*: _____

_____
Religious or Spiritual Leader Name *(Printed)*

Telephone #: _____

Email: _____

_____
Religious or Spiritual Leader Signature

Religion: _____

Exhibit C

**VERIFIED STATEMENT OF** _Thomas T Morris_

1. I, _Thomas T Morris_, am an employee of _City of Chicago_ _DWM_. My position is _Hoisting Engineer_.

2. I have been employed in that position for _October 16, 1998_.

3. I have read the Complaint and affirm that it is true and correct to the best of my ability and recollection.

4. City of Chicago has required that I identify my vaccine status using an online portal.

5. I have done so.

6. I have chosen not to vaccinate due to my deeply held religious beliefs.

7. I _X_ sought a religious exemption ___ did not seek a religious exemption because I believe the form that I was asked to use was unfair, and was setting me up to fail.

8. If called to testify, I could testify truthfully to the above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on _Oct 21, 2021_.

Exhibit B



### City of Chicago
### COVID-19 Vaccine Religious Exemption Request

**SECTION I: Employee Information (Please Print or Type)**

**Employee Name:** *Thomas T Morris*   **Department:** *Water Management*

**Job Title:** *Hoisting Engineer*   **Manager:** *John Ware*

**Daytime Phone:** *773-892-8671*   **Religion:** *Non-Denominational*

I am requesting a religious exemption from the City of Chicago's Mandatory COVID-19 Vaccination Policy. By signing this form, I certify that the information I have provided is true and accurate to the best of my knowledge. I understand that deliberately providing false or misleading information in support of my request for religious exemption from the City of Chicago's Mandatory COVID-19 Vaccination Policy or refusing to engage in the interactive process with the Department of Human Resources regarding the applied for exemption under the Vaccination Policy may result in disciplinary action, up to and including termination, under the City's Personnel Rules.

I further understand that in some cases, the City will need to obtain additional information and/or documentation about my religious practice(s) or belief(s) or may need to discuss the nature of my religious belief(s), practice(s) and accommodation with my religion's spiritual leader (if applicable) or religious scholars, to address my request for an exemption.

**Employee Signature:** _____   **Date:** *10-14-2021*

**SECTION II: Exemption Information**

**Please state your reason for requesting a religious exemption to the COVID-19 vaccine requirement.**

*SEE   Attachment   I*

**Return Certifications to:**
Department of Human Resources
Email: vaccineexemptions@cityofchicago.org

Exhibit B



## City of Chicago
## COVID-19 Vaccine Religious Exemption Request

**What is the principle of your religious beliefs that conflicts with taking the COVID-19 vaccine?** In your response to this question, please include a description of the specific way that your religious beliefs prevent you from being vaccinated.

*SEE Attachment I*

**When did you begin practicing this religion or following these beliefs?**

*SEE Attachment II*

**Do your religious beliefs include objections to other vaccines or medications?** If so, please explain.

*SEE Attachment I & II*

Employee Signature: _____

Date (MM/DD/YYYY): *10-14-2021*

### SECTION III: Religious or Spiritual Leader – Complete this section

**Affirmation of belief:** *I have met with and provided religious or spiritual counsel to the above employee regarding their sincerely held religious beliefs and practices. I affirm that this employee is a member of our religious organization. I further affirm that these beliefs regarding any immunization or immunizing agent are in line with the tenets of our religious or spiritual faith, teachings, and/or practices.*

*Thomas T Morris (Rev.)*

Religious or Spiritual Leader Name *(Printed)*

Date (MM/DD/YYYY): *10-14-2021*

Telephone #: *773-609-0050*

Email: *T2M9LIVE@GMAIL.com*

Religious or Spiritual Leader Signature

Religion: *NON-DENOMINATIONAL*

**Return Certifications to:**
Department of Human Resources
Email: vaccineexemptions@cityofchicago.org

 **Gmail**

**Thomas T Morris <t2m9live@gmail.com>**

---

**Religious Exemption**
1 message

*Attachement I    Part I*

---

Thomas T Morris <t2m9live@gmail.com>                                        Thu, Oct 14, 2021 at 11:25 PM
To: t2m9live <t2m9live@gmail.com>

Dear H.R. Commissioner,

First, I request a religious exemption, "Each of the manufactures of the Covid vaccines currently available developed and confirmed their vaccines using fetal cell lines, which originated from aborted fetuses. ( https://lozierinstitute.org/an-ethics-assessment-of-covid-19-vaccine-programs/ ) For example, each of the currently available Covid vaccines confirmed their vaccine by protein testing using the abortion-derived cell line HEK-293. ( https://lozierinstitute.org/an-ethics-assessment-of-covid-19-vaccine-programs/ ) Partaking in a vaccine made from aborted fetuses makes me complicit in an action that offends my religious faith. As such, I cannot, in good conscience and in accord with my religious faith, take any such Covid vaccine at this time. In addition, any coerced medical treatment goes against my religious faith and the right of conscience to control one's own medical treatment, free of coercion or force. As fellow governments recognize: "Religion includes all aspects of religious observance and practice, as well as belief. Religious beliefs are not only those beliefs held by traditional, organized religions, but also include moral or ethical beliefs as to what is right or wrong which are sincerely held with the strength of traditional religious views." (https://www.ilga.gov/legislation/ilcs/ilcs3.asp?ActID=2082&ChapterID=58) and (https://www.un.org/en/about-us/universal-declaration-of-human-rights) Article 18. Please provide a reasonable accommodation to my belief, as I wish to continue to be a good employee.

Equally, compelling any employee to take any current Covid-19 vaccine violates federal and state law, and subjects the employer to substantial liability risk, including liability for any injury the employee may suffer from the vaccine. Many employers have reconsidered issuing such a mandate after more fruitful review with legal counsel, insurance providers, and public opinion advisors of the desires of employees and the consuming public. Even the Kaiser Foundation warned of the legal risk in this respect. (https://www.kff.org/coronavirus-covid-19/issue-brief/key-questions-about-covid-19-vaccine-mandates/)

Three key concerns: first, informed consent is the guiding light of all medicine, in accord with the Nuremberg Code of 1947; second, the Americans with Disabilities Act proscribes, punishes and penalizes employers who invasively inquire into their employees' medical status and then treat those employees differently based on their perceived medical status, as the many AIDS related cases of decades ago fully attest; and third, international law, Constitutional law, specific statutes and the common law of torts all forbid conditioning access to employment, education or public accommodations upon coerced, invasive medical examinations and treatment, unless the employer can fully provide objective, scientifically validated evidence of the threat from the employee and how no practicable alternative could possible suffice to mitigate such supposed public health threat and still perform the necessary essentials of employment. As one federal court just recently held, the availability of reasonable accommodations like accounting for prior infection, antibody testing, temperature checks, remote work, other forms of testing, and the like suffice to meet any institution's needs in lieu of masks, public shaming, and forced injections of foreign substances into the body that the FDA admits we do not know the long -term effects of.

For instance, the symptomatic can be self-isolated. Hence, requiring vaccinations only addresses one risk: dangerous or deadly transmission, by the asymptomatic or pre-symptomatic employee, in the employment setting. Yet even government official Mr. Fauci admits, as scientific studies affirm, asymptomatic transmission is exceedingly and "very rare." Indeed, initial data suggests the vaccinated are just as, or even much more, likely to transmit the virus as the asymptomatic or pre-symptomatic. Hence, the vaccine solves nothing. This evidentiary limitation on any employer's decision making, aside from the legal and insurance risks of forcing vaccinations as a term of employment without any accommodation or even exception for the previously infected (and thus better protected), is the reason most employers wisely refuse to mandate the vaccine. This doesn't even address the arbitrary self-limitation of the pool of talent for the employer: why reduce your own talent pool, when many who refuse invasive inquiries or risky treatment may be amongst your most effective, efficient and profitable employees?

This right to refuse forced injections, such as the Covid-19 vaccine, implements the internationally agreed legal requirement of Informed Consent established in the Nuremberg Code of 1947. (http://www.cirp.org/library/ethics/nuremberg/ ). As the Nuremberg Code established, every person must "be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, overreaching, or other ulterior form of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved as to enable him to make an understanding and enlightened decision" for any medical experimental drug, as the Covid-19 vaccine currently is.

Second, demanding employees divulge their personal medical information invades their protected right to privacy, and discriminates against them based on their perceived medical status, in contravention of the Americans with Disabilities Act. (42 USC §12112(a).) Indeed, the ADA prohibits employers from invasive inquiries about their medical status, and that includes questions about diseases and treatments for those diseases, such as vaccines. As the EEOC makes clear, an employer can only ask medical information if the employer can prove the medical information is both job-related and necessary for the business. (https://www.eeoc.gov/laws/guidance/questions-and-answers-enforcement-guidance-disability-related-inquiries-and-medical). An employer that treats an individual employee differently based on that employer's belief the employee's medical condition impairs the employee is discriminating against that employee based on perceived medical status disability, in contravention of the ADA. The employer must have proof that the employer cannot keep the employee, even with reasonable accommodations, before any adverse action can be taken against the employee. If the employer asserts the employee's medical status (such as being unvaccinated against a particular disease) precludes employment, then the employer must prove that the employee poses a "safety hazard" that cannot be reduced with a reasonable accommodation. The employer must prove, with objective, scientifically validated evidence, that the employee poses a materially enhanced risk of serious harm that no reasonable accommodation could mitigate. This requires the employee's medical status cause a substantial risk of serious harm, a risk that cannot be reduced by any another means. This is a high, and difficult burden, for employers to meet. Just look at the all prior cases concerning HIV and AIDS, when employers discriminated against employees based on their perceived dangerousness, and ended up paying millions in legal fees, damages and fines.

Third, conditioning continued employment upon participating in a medical experiment and demanding disclosure of private, personal medical information, may also create employer liability under other federal and state laws, including HIPAA, FMLA, and applicable state tort law principles, including torts prohibiting and proscribing invasions of privacy and battery. Indeed, any employer mandating a vaccine is liable to their employee for any adverse event suffered by that employee. The CDC records reports of the adverse events already reported to date concerning the current Covid-19 vaccine.(https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/vaers.html )

Finally, forced vaccines constitute a form of battery, and the Supreme Court long made clear "no right is more sacred than the right of every individual to the control of their own person, free from all restraint or interference of others." (https://www.law.cornell.edu/supremecourt/text/141/250)

With Regards,

Hoisting Engineer,
Thomas T. Morris



### The Universal Light, Inc
**11431 Ramondi Pl.**
**Cincinnati, OH 45240**
*www.theuniversallight.com*
*tulight@cinci.rr.com*
*(513) 825-8290*

*9/5/2021*

To Whom It May Concern,

The United States has classified The Universal Light as a 501C3 church. We have a large congregation, and our beliefs are protected by the 1st. and 14th. Amendments of the Constitution.

Our mission is natural healing, and we function as a Metaphysical organization. We exercise effort and energy in having Faith and Trust in the Creator of all that is, was or ever will be. Each member is unique and their method of exercising these beliefs varies. We continue to encourage their efforts to practice their beliefs as guided by their Creator.

We have a Federal legal precedent stating that no one has the right to question our beliefs for to do so would be an infringement upon our 1st. Amendment right of religious freedom.

We sincerely hope that we have explained our position more fully and therefore, you will uphold our member's religious objection to vaccination.

Yours in the LIGHT with LOVE, I AM,

Bishop Audrey Marsh

P.S. Thomas Morris of Chicago, IL is a member in good standing with us.

PPS. Should you doubt the above, contact a Constitutional Attorney for this is not a local issue but a Constitutional issue for a Federal court.

## VERIFIED STATEMENT OF <u>SAAD BRUCE SHAAR</u>

1.    I, <u>SAAD BRUCE SHAAR</u>, am an employee of <u>CITY OF</u> <u>CHICAGO , DEPARTMENT OF WATER MANAGEMENT</u>

_____. My position is <u>MOTOR TRUCK DRIVER</u>.

2.    I have been employed in that position for _____ <u>21 YEARS</u>.

3.    I have read the Complaint and affirm that it is true and correct to the best of my ability and recollection.

4.    City of Chicago has required that I identify my vaccine status using an online portal.

5.    I have done so. *I, Saad Bruce Shaar, am currently on duty disability as of the signing of this statement and exempt from identifying my status using an online portal.*

6.    I have chosen not to vaccinate due to my deeply held religious beliefs.

7.    I _X_ sought a religious exemption ___ did not seek a religious exemption because I believe the form that I was asked to use was unfair, and was setting me up to fail.

8.    If called to testify, I could testify truthfully to the above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on __OCTOBER 21,2021__.

SAAD BRUCE SHAAR

## VERIFIED STATEMENT OF <u>MICHAEL REPEL</u>

1. I, **Michael Repel**, am an employee of _The City of Chicago Department of Water Management_.  My position is **Emergency Crew Dispatcher**.

2. I have been employed in that position for **9 Years**, but have a total of 21 years with the Department of Water Management.

3. I have read the Complaint and affirm that it is true and correct to the best of my ability and recollection.

4. City of Chicago has required that I identify my vaccine status using an online portal.

5. I have done so.

6. I have chosen not to vaccinate due to my deeply held religious beliefs.

7. I **have** sought a religious exemption which has not yet been approved.

8. If called to testify, I could testify truthfully to the above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on **October 21st 2021**.

**VERIFIED STATEMENT OF** _Gary J. Duszak_

1. I, _Gary J. Duszak_, am an employee of _The Chicago Fire Dept_. My position is _Captain/EMT_.

2. I have been employed in that position for _since 10/1/1999_.

3. I have read the Complaint and affirm that it is true and correct to the best of my ability and recollection.

4. City of Chicago has required that I identify my vaccine status using an online portal.

5. I have not done so because I believe that the information is private, and because I am concerned about my data being sent online, which is not as secure as handing in something in paper.

6. I have chosen not to vaccinate due to my deeply held religious beliefs.

7. I ___ sought a religious exemption _X_ did not seek a religious exemption because I believe the form that I was asked to use was unfair, and was setting me up to fail.

8. If called to testify, I could testify truthfully to the above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on _10-21-2021_.

**VERIFIED STATEMENT** OF _Janet Contursi_

1. I, _Janet Contursi_, am an employee of _the City of Chicago_ _____. My position is _Firefighter/Paramedic_

2. I have been employed in that position for _25 years_.

3. I have read the Complaint and affirm that it is true and correct to the best of my ability and recollection.

4. City of Chicago has required that I identify my vaccine status using an online portal.

5. I have not done so because I believe that the information is private, and because I am concerned about my data being sent online, which is not as secure as handing in something in paper.

6. I have chosen not to vaccinate due to my deeply held religious beliefs.

7. I ___ sought a religious exemption _X_ did not seek a religious exemption because I believe the form that I was asked to use was unfair, and was setting me up to fail.

8. If called to testify, I could testify truthfully to the above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on _10 / 21 / 2021_.

_Janet Contursi_

**VERIFIED STATEMENT OF** _Scott Troogstad_

1. I, _Scott Troogstad_, am an employee of _the City of Chicago_ _____. My position is _Captain / EMT_ .

2. I have been employed in that position for _22 yrs on CFD_ (1 yr 9 mo Cpt)

3. I have read the Complaint and affirm that it is true and correct to the best of my ability and recollection.

4. City of Chicago has required that I identify my vaccine status using an online portal.

5. I have not done so because I believe that the information is private, and because I am concerned about my data being sent online, which is not as secure as handing in something in paper.

6. I have chosen not to vaccinate due to my deeply held religious beliefs.

7. I ___ sought a religious exemption _X_ did not seek a religious exemption because I believe the form that I was asked to use was unfair, and was setting me up to fail.

8. If called to testify, I could testify truthfully to the above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on _10/21/2021_ .

**VERIFIED STATEMENT OF** _ROBERT TEBBENS_

1. I, _ROBERT TEBBENS_ , am an employee of _THE CHICAGO FIRE DEPT._
_____. My position is _FIRE CAPTAIN/EMT_

2. I have been employed in that position for _SINCE 12/1/94_.

3. I have read the Complaint and affirm that it is true and correct to the best of my ability and recollection.

4. City of Chicago has required that I identify my vaccine status using an online portal.

5. I have not done so because I believe that the information is private, and because I am concerned about my data being sent online, which is not as secure as handing in something in paper.

6. I have chosen not to vaccinate due to my deeply held religious beliefs.

7. I ___ sought a religious exemption _X_ did not seek a religious exemption because I believe the form that I was asked to use was unfair, and was setting me up to fail.

8. If called to testify, I could testify truthfully to the above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on _10/21/21_.