IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT

| | |
|---|---|
| SCOTT TROOGSTAD, *et al,* | |
| Plaintiffs, | |
| v. | 2021 CV 5600 |
| CITY OF CHICAGO, *et al,* | |
| Defendants. | |

**PLAINTIFFS' REPLY TO ALL DEFENDANTS IN SUPPORT OF ITS PETITION FOR A PRELIMINARY INJUNCTION**

Respectfully submitted by,

Jonathan Lubin
8800 Bronx Ave.
Suite 100H
Skokie, IL 60077
773 954 2608
jonathan@lubinlegal.com

**Table of Contents**

**Introduction** ........................................................................................................................1

**Argument** ............................................................................................................................1

    *I.    Natural immunity, vaccine immunity, and the reasonable concern regarding adverse effects of COVID-19 vaccines* ................................................................................................................................1

    *II.    There is a likelihood of success on the merits of Plaintiffs' substantive due process claim.* ............................6

    *III.    There is a likelihood of success on Plaintiffs' procedural due process claim.* ...................................14

    *IV.    There is a likelihood of success on Plaintiff's claim, against the City, under the Health Care Right of Conscience Act.* ................................................................................................................18

    *V.    There is a likelihood of success on Plaintiff's Free Exercise clause claim.* ....................................19

    *VI.    Plaintiffs will experience irreparable harm if their Petition is not granted.* ...................................20

    *VII.    The Balancing of the hardships favors Plaintiffs.* ..............................................................22

**Conclusion** ........................................................................................................................23

## Table of Authorities

**Cases**

Bagley v. Blagojevich, 646 F.3d 378 (7th Cir. 2011) ................................................................15

Buck v. Bell, 274 U.S. 200 (1927) .............................................................................................8

Cassel v. Snyders, 990 F.3d 539 (7 Cir., 2021) .......................................................................16

Cassell v. Snyders, 458 F. Supp. 3d 981 (N.D. Ill. 2020) ........................................................19

Cruzan v. Director, Mo. Dept. of Health, 497 U.S. 261 (1990) ............................................ 9, 17

Ex parte Young, 209 U. S. 123 (1908) .....................................................................................16

Gallas v. Supreme Court of Pa., 211 F.3d 760 (3d Cir. 2000) .................................................15

GEFT Outdoors, LLC v. City of Westfield, 922 F.3d 357 (7 Cir., 2019) .................................16

Greene v. McElroy, 360 U.S. 474 (1959) ............................................................................ 12, 21

Harris v. Univ. of Massachusetts, Lowell, No. 21-CV-11244-DJC, 2021 WL 3848012 (D. Mass. Aug. 27, 2021) .....................................................................................................................15

Jacobson v. Massachusetts, 197 U.S. 11 (1905) ................................................................passim

Joelner v. Village of Washington Park, Illinois, 378 F.3d 613 (7th Cir., 2004) .......................21

Klaasen v. Trustees of Indiana Univ., 7 F.4th 952 (2021) ........................................... 10, 11, 12

Maniscalco v. New York City Dep't of Educ., No. 21-CV-5055 (BMC), 2021 WL 4344267 (E.D.N.Y. Sept. 23, 2021)....................................................................................................13

Marshall v. United States, 414 U.S. 417 (1974) .......................................................................13

Minerva Dairy, Inc. v. Harsdorf, 905 F.3d 1047 (7th Cir. 2018) ...................................... 11, 21

Park Ridge Sports, Inc. v. Park Ridge Travel Falcons, No. 20 C 2244, 2020 WL 6265133 (N.D. Ill. Aug. 20, 2020), report and recommendation adopted as modified, No. 20 C 2244, 2020 WL 6262394 (N.D. Ill. Oct. 23, 2020).................................................................................21

Pennhurst State School and Hospital v. Halderman, 465 U.S. 89 (1984).................................16

Planned Parenthood v. Casey, 505 U.S. 833 (1992)...................................................................9

Riggins v. Nevada, 504 U.S. 127 (1992) ....................................................................................9

Rochin v. California, 342 U.S. 165 (1952) ..................................................................................9

Roe v. Wade, 410 U.S. 113 (1973)..............................................................................................7

Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S.Ct. 63 (2020)............................... 9, 10, 12

S. Bay United Pentecostal Church v. Newsom. 140 S.Ct. 1613 (2020) ....................................13

Turnell v. CentiMark Corp., 796 F.3d 656 (7th Cir. 2015) .......................................................21

Vill. of Orland Park v. Pritzker, 475 F. Supp. 3d 866 (N.D. Ill. 2020) ....................... 16, 17, 18

Washington v. Harper, 494 U.S. 210 (1990)...............................................................................9

Wroblewski v. City of Washburn, 965 F.2d 452 (7th Cir. 1992) ........................................ 17, 21

Zorzi v. Cty. of Putnam, 30 F.3d 885 (7th Cir. 1994) ...............................................................17

**Statutes and Ordinances**

20 ILCS 3305/7...........................................................................................................................17

Chicago Mun. Code 2-4-020 ......................................................................................................14

**Scientific Journals**

Ashley, *Effectiveness of Covid-19 Vaccines against the B.1.617.2 (Delta) Variant*, The New England School of Medicine, Vol. 385 at 585-94 (Aug. 12, 2021) .................................................................................1

Assis, Rafael, *Distinct Sars CoV-2 Antibody Responses Elicited by Natural Infection and mRNA Vaccination*, BioRxiv (May 19, 2021) ...................................................................................................................3

Cavanaugh, Alyson, *Reduced Risk of Reinfection with SARS CoV-2 After COVID-19 Vaccination* – May-June 2021, Morbidity and Mortality Weekly Report, Centers for Disease Control and Prevention, Issue 70(32) at 10801-83 (Aug. 13, 2021).......................................................................................2

Cohen, Kristen*, Longitudinal analysis shows durable and broad immune memory after SARS-CoV-2 infection with persisting antibody responses and memory B and T cells*, Cell Reports Magazine Vol. 2 Issue 7 (July 20, 2021)................................................................................................................................................5

Elizabeth Caldwell & Matt Trotter, *Covid Reinfections have jumped 300% Since May,* Public Radio Tulsa (Sept., 24, 2021)...............................................................................................................................2

Iversen, Kasper, *Seroprevalence of SARS-CoV-2 antibodies and reduced risk of reinfection through 6 months: a Danish observational cohort study of 44 000 healthcare workers,* Clinical Microbiology and Infection (Sept. 17, 2021)......................................................................................................................... 2, 3

O Murchu E, *Quantifying the risk of SARS-CoV-2 reinfection over time.* Rev Med Virol. 2021 May 27:e2260. doi: 10.1002/rmv.2260. Epub ahead of print. PMID: 34043841; PMCID: PMC8209951 ......................................................................................................................................................4

Shrestha, Nabin, *Necessity of COVID-19 vaccination in previously infected individuals* (June 19, 2021)...........4

Subramanian, S.V., Kumar, A. Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States. Eur J Epidemiol (2021). ...................................5

**Introduction**

Defendants, with the benefit of extremely able attorneys, Responded to Plaintiffs' Petition in separate filings. Given that the discussion of substantive due process hinges to some extent on the efficacy of COVID-19 vaccines and on the efficacy of natural immunity, this Reply will first discuss some of Defendants' arguments about the science, and their citations to scientific authority, then will offer counterarguments to Defendants' discussions of the same. Next, the Reply will discuss the likelihood of success on the merits of both the substantive and procedural due process claims, the free exercise claim, and the claim under the Health Care Right of Conscience Act. The brief will then deal with the other prongs of a preliminary injunction, namely irreparable harm and the balancing of hardships.

**Argument**

I.     *Natural immunity, vaccine immunity, and the reasonable concern regarding adverse effects of COVID-19 vaccines.*

Defendants' treatment of the efficacy of vaccines against natural immunity is incomplete, and plagued by many of the deficiencies that the Response identifies in Plaintiff's Petition. The treatment of the matter can roughly be divided into two categories of studies or observations: a.) studies of laboratory conditions which provide predictions as to the efficacy of vaccines or natural immunity, and b.) studies of actual rates of transmission over a given population. The studies cited by Defendants tend towards the former. Studies that did not compare natural immunity and vaccine immunity (like Fowles, Ashley, *Effectiveness of Covid-19 Vaccines against the B.1.617.2 (Delta) Variant*, The New England School of Medicine, Vol. 385 at 585-94 (Aug. 12, 2021)[1]) and those that do not identify any methodology (Elizabeth Caldwell & Matt Trotter, *Covid Reinfections have jumped 300%*

---

[1] https://www.nejm.org/doi/full/10.1056/nejmoa2108891

1

*Since May,* Public Radio Tulsa (Sept., 24, 2021)[2] offer little for this Court to analyze (and the time constraints placed upon this Reply make any significant analysis here difficult).

A notable exception to this general trend was Cavanaugh, Alyson, *Reduced Risk of Reinfection with SARS CoV-2 After COVID-19 Vaccination* – May-June 2021, Morbidity and Mortality Weekly Report, Centers for Disease Control and Prevention, Issue 70(32) at 10801-83 (Aug. 13, 2021)[3], a CDC-sponsored study that found that the unvaccinated were twice as likely to be "reinfected[4]" as those with natural immunity. No analysis was offered regarding age, severity of infection, or other facts. The study cautioned that it was culled from "data from a single state during a 2-month period." Regardless, its finding was not that there was a drastic difference, in real-world conditions, between vaccine immunity and natural immunity. Another notable exception to the trend was Iversen, Kasper, *Seroprevalence of SARS-CoV-2 antibodies and reduced risk of reinfection through 6 months: a Danish observational cohort study of 44 000 healthcare workers,* Clinical Microbiology and Infection (Sept. 17, 2021)[5]. It made a few very relevant observations:

> In infected individuals, antibodies against SARS-CoV-2 can be detected at an estimated mean of 12–15 days from the onset of symptoms, and virtually all SARS-CoV-2-infected, immunocompetent individuals seroconvert within 19–50 days. Antibody development is generally thought to be one of the most important measures to prevent COVID-19 reinfection. However, reinfection has been reported in public media and case reports. In these reports reinfected individuals were often asymptomatic during the first course of infection with SARS-CoV-2. Recently, one larger cohort study found reinfection with SARS-CoV-2 to be rare and mild up to 6 months post primary infection, but the rate of seroreversion is still unknown.

---

[2] https://www.publicradiotulsa.org/post/covid-reinfections-have-jumped-300-may#stream/0
[3] https://www.cdc.gov/mmwr/volumes/70/wr/mm7032e1.htm
[4] The study did not use the term "breakthrough infection," so it appears as though infection after vaccination was categorized as a reinfection.
[5] https://www.clinicalmicrobiologyandinfection.com/article/S1198-743X(21)00495-X/fulltext

Translated to plain English, natural immunity (antibody development) is "one of the most important measures to prevent COVID-19 reinfection." Reinfection after having symptomatic cases of COVID-19 are rare. The study also found

> a gradual and significant increase in seroprevalence in [Health Care Workers] from April to October 2020. HCWs with antibodies to SARS-CoV-2 had a 65% reduction in risk of reinfection during the following 6 months, and approximately 95% of those who were seropositive during the first round remained seropositive after 6 months. Seroreverters were slightly older and had a milder course of disease.

This finding is consistent with the above: those who had a milder course of COVID-19 were more likely to be reinfected. But the antibodies to COVID-19 among those who had been infected were significant (65% risk of reinfection – nearly identical to the efficacy of the Johnson & Johnson vaccine).

The rest of the studies were largely predictions based upon laboratory conditions. Of those, the majority of those studies are months old, and therefore could not involve analyses of even the eight months of data that the Response criticized regarding the Israel study. For example, Assis, Rafael, *Distinct Sars CoV-2 Antibody Responses Elicited by Natural Infection and mRNA Vaccination*, BioRxiv (May 19, 2021)[6], a non-peer reviewed study, analyzed blood samples in Orange County, CA between April 2020 and March 2021. The greater part of the study, therefore, took place before vaccines were available. At best, it offered learned predictions about what *would* happen. But we now have real world data to rely upon. Similarly, Liu, Weimin, *Predictors of Nonseroconversion after SARS-CoV-2 Infection*, Emerging Infections Diseases Vol. 27 No. 9, Centers for Disease Control and Prevention (Jun. 30, 2021)[7], a CDC sponsored study, was based upon blood samples of only 72 people, and the study does not identify any time period.

---

[6] https://www.biorxiv.org/content/10.1101/2021.04.15.440089v4.full
[7] https://wwwnc.cdc.gov/eid/article/27/9/21-1042_article

The real-world analysis of the waning efficacy of vaccine immunity as against natural immunity is not relegated to Israel. Here in this country, comparisons between vaccinated and unvaccinated employees of the Cleveland Clinic Health System also offered insights into the efficacy of vaccines. The Cleveland Clinic Health System study had a large sample size of 52,238 employees, of whom 1359 were previously infected and unvaccinated. During the five months of the study, none of the previously infected unvaccinated participants contracted COVID-19. Vaccines proved quite effective, but not as effective as natural immunity[8].

Similarly, a peer-reviewed paper that analyzed eleven separate studies conducted across the world, found that, out of 615,777 participants, over a period of time of up to 10 months, "reinfection was a rare event (median PCR-confirmed reinfection rate: 1.27%, range 0%-1,1%), with no study reporting an increase in the risk of reinfection over time.[9] This latter finding is key, as most of the studies reported in the Governor's response were from fairly early on in the vaccination process, and we are now seeing the tapering off of vaccine immunity internationally (one of the reasons for a new push for booster shots among the already vaccinated)[10]. The situation has gotten to the point where, in Israel, a booster shot may be required to legally qualify as "fully vaccinated" for the purpose of Israel's "Green Pass," or Covid passport[11] [12]. How far is Illinois from extending its mandate similarly?

Some laboratory studies have confirmed what experience now demonstrates. For example, a July, 2021 study found that natural immunity provides long term and broad immunity to reinfection.

---

[8] Shrestha, Nabin, *Necessity of COVID-19 vaccination in previously infected individuals* (June 19, 2021), accessed at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3.article-info
[9] O Murchu E, *Quantifying the risk of SARS-CoV-2 reinfection over time*. Rev Med Virol. 2021 May 27:e2260. doi: 10.1002/rmv.2260. Epub ahead of print. PMID: 34043841; PMCID: PMC8209951., accessed at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8209951/
[10] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html
[11] https://www.wsj.com/articles/covid-19-booster-shots-are-available-for-all-in-israel-younger-people-arent-convinced-11633858202
[12] https://news.yahoo.com/israel-tightened-covid-vaccine-pass-102710216.html?_guc_consent_skip=1633345808

"Ending the COVID-19 pandemic will require long-lived immunity to SARS-CoV-2. Here, we evaluate 254 COVID-19 patients longitudinally up to 8 months and find durable broad-based immune responses."[13] In other words, the durable immunity offered by collective natural immunity (referred to sometimes as herd immunity) is the key to defeating COVID-19, and not necessarily booster after booster. As to the claim that those who tested positive for COVID-19 but were asymptomatic may have weaker immunity, a study published in the Journal of Experimental Medicine found that to be untrue: "Our study shows that the ability to mount a significant virus-specific T cell response is not necessarily associated with symptom severity."[14]

Finally, as the Complaint alleges, a newly published study found that there is "no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases in the last 7 days." The study found, to the contrary, that there was "a marginally positive association such that countries with higher percentage of population fully vaccinated have higher COVID-19 cases per 1 million people." That study, which analyzed 68 different countries' vaccination rates and the rate of new COVID-19 cases, specifically referred to Israel, Portugal and Iceland, each of which is highly vaccinated and which had more cases per 1 million people than, for example, Vietnam and South Africa, which have around 10% of their population fully vaccinated.[15] This study obviously does not suggest that vaccines are not helpful in saving lives. For many, they may well have been the difference between life and death. But the justification for the vaccine mandate here has never been that employees who are vaccinated are more likely to survive a bout with COVID-19. Rather, the justification has been that one's decision not to vaccinate may hurt *others*. This new study suggests

---

[13] Cohen, Kristen, *Longitudinal analysis shows durable and broad immune memory after SARS-CoV-2 infection with persisting antibody responses and memory B and T cells*, Cell Reports Magazine Vol. 2 Issue 7 (July 20, 2021), accessed at https://www.cell.com/cell-reports-medicine/fulltext/S2666-3791(21)00203-2#%20

[14] Le Bert, Nina, *Highly functional virus-specific cellular immune response in asymptomatic SARS-CoV-2 infection*, Journal of Experimental Medicine (March 1, 2021), accessed at https://rupress.org/jem/article/218/5/e20202617/211835/Highly-functional-virus-specific-cellular-immune

[15] Subramanian, S.V., Kumar, A. Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States. Eur J Epidemiol (2021). https://doi.org/10.1007/s10654-021-00808-7

that this justification lies on shaky ground. If there is no correlation between the percentage of a population that is vaccinated in success in preventing a rise in 7-day case numbers, the only remaining basis for vaccinating is self-preservation as opposed to the protection of others.

It is true that the vaccines are largely safe. Largely safe does not mean completely safe. Sweden recently paused the use of the Moderna vaccine among young adults due to the risk of inflammation of the heart and the pericardium. The pause appears to be in effect until December 1 at least.[16] Denmark has followed suit for those between 12-17 years of age.[17] The Petition does not suggest that vaccines are dangerous. But it does suggest that vaccines are not without risk entirely. The Responses suggest that mRNA vaccines have been researched for decades, but they have only been in active use (emergency use at that) for months. Asking somebody to vaccinate is asking them to take a risk. The rejoinder is also true: choosing not to vaccinate is choosing to take a risk. The recognition that choices are not risk free, and that the efficacy of vaccines is not as great as what was initially advertised, mitigates against a top-down mandate, and in favor of freedom of choice.

II.     *There is a likelihood of success on the merits of Plaintiffs' substantive due process claim.*

Defendants suggest that <u>Jacobson v. Massachusetts</u>, 197 U.S. 11 (1905), almost by its very existence, suggests that this Court cannot find for Plaintiffs on the question of substantive due process. This is wrong for two reasons: a.) the facts between COVID-19 in 2021 and smallpox in the early 1900s are wildly different; and b.) the law has changed and matured since <u>Jacobson</u>.

In <u>Jacobson</u>, the Supreme Court had occasion to comment not only on the constitutionality of the smallpox vaccine mandate (that was enacted by the Massachusetts state legislature and passed by various municipalities through the proper democratic process), but also on the science of the day. Justice Harlan offers a long footnote describing the history and science of smallpox vaccines. "State-

---

[16] https://www.yahoo.com/news/sweden-halts-modernas-covid-vaccine-133409796.html
[17] https://www.reuters.com/business/healthcare-pharmaceuticals/sweden-pauses-use-moderna-covid-vaccine-cites-rare-side-effects-2021-10-06/

supported facilities for vaccination began in England in 1808." *Id.* at 31, fn. 1. The footnote quotes a Dr. Buchanan, the medical officer of the London Government Board, from over 20 years prior to the decision: "the smallpox death rate among adult persons vaccinated was 90 to a million; whereas among those unvaccinated it was 3,350 to a million." *Id.* at 33, fn. 1. The event that precipitated the smallpox mandate was the 1901-1903 outbreak of smallpox. Smallpox was common (3 cases per 1000 persons in Boston), and the mortality rate was very high (17%).[18]

COVID-19, by contrast, is not even in the same ballpark in terms of the mortality rate (thankfully!). The mortality rate of COVID-19 in the United States is 1.6%.[19] That number moves drastically downward by age.[20] While the smallpox vaccines had existed for a century by the time the Jacobson decision was announced, COVID-19 vaccines have been commonly available for less than a year. The long-term data on both the long term efficacy and safety of COVID-19 vaccines is limited to just over one year, as compared with a century in the case of Jacobson.

COVID-19 is, by all accounts, a very serious pandemic. But the comparisons to the holding in Jacobson should be examined with the vast difference in the exigencies of the situations in mind. The extent of the emergency must have some relationship to the extent of the imposition. This is explicitly recognized in Roe v. Wade, 410 U.S. 113 (1973):

> appellant and some amici argue that the woman's right is absolute and that she is entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever reason she alone chooses. With this we do not agree. Appellant's arguments that Texas either has no valid interest at all in regulating the abortion decision, or no interest strong enough to support any limitation upon the woman's sole determination, are unpersuasive. The Court's decisions recognizing a right of privacy also acknowledge that some state regulation in areas protected by that right is appropriate. As noted above, a State may properly assert important interests in safeguarding health,

---

[18] https://www.nejm.org/doi/full/10.1056/NEJM200102013440511
[19] https://coronavirus.jhu.edu/data/mortality
[20] Smorenberg A. *How does SARS-CoV-2 targets the elderly patients? A review on potential mechanisms increasing disease severity.* Eur J Intern Med. 2021 Jan;83:1-5. doi: 10.1016/j.ejim.2020.11.024. Epub 2020 Nov 30. PMID: 33303345; PMCID: PMC7703548. Accessed at https://pubmed.ncbi.nlm.nih.gov/33303345/

> in maintaining medical standards, and in protecting potential life. At some point in pregnancy, these respective interests become sufficiently compelling to sustain regulation of the factors that govern the abortion decision. The privacy right involved, therefore, cannot be said to be absolute. In fact, it is not clear to us that the claim asserted by some amici that one has an unlimited right to do with one's body as one pleases bears a close relationship to the right of privacy previously articulated in the Court's decisions. The Court has refused to recognize an unlimited right of this kind in the past. *Id.* at 153-4, citing Jacobson and Buck v. Bell, 274 U.S. 200 (1927)[21].

This is an explicit recognition of the fact that while the right to privacy and bodily autonomy are not absolute, they *do* exist on a sliding scale: the greater the interest of society as against the private interest, the greater the possibility that said interest may be subject to state control. Compare that to Jacobson:

> Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. It is only freedom from restraint under conditions essential to the equal enjoyment of the same right by others. It is, then, 'liberty regulated by law.' In the Constitution of Massachusetts adopted in 1780 it was laid down as a fundamental principle of the social compact that the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for 'the common good,' and that government is instituted 'for the common good, for the protection, safety, prosperity, and happiness of the people, and not for the profit, honor, or private interests of any one man, family, or class of men.' The good and welfare of the commonwealth, of which the legislature is primarily the judge, is the basis on which the police power rests in Massachusetts. Jacobson, 197 U.S. at 26-7.

As Defendants point out, Roe recognizes that Jacobson is precedent for the proposition that liberty interests can sometimes be subordinated to the common good. But where Jacobson suggests that one's liberty is subject to a majority vote of the legislature (which we do not have in this case,

---

[21] It also bears noting that Roe finds Jacobson and Buck to be birds of a feather – as opposed to the Governor's suggestion that referencing Buck is a kind of slippery slope logical fallacy.

incidentally), <u>Roe</u> recognizes that this is not the case. A person's individual liberty can overcome a government's interest in protecting the general good.

This becomes even more clear in <u>Planned Parenthood v. Casey</u>, 505 U.S. 833 (1992):

> <u>Roe</u>, however, may be seen not only as an exemplar of <u>Griswold</u> liberty but as a rule (whether or not mistaken) of personal autonomy and bodily integrity, with doctrinal affinity to cases recognizing limits on governmental power to mandate medical treatment or to bar its rejection. If so, our cases since <u>Roe</u> accord with <u>Roe</u>'s view that a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims. *Id.* at 857. <u>Cruzan v. Director, Mo. Dept. of Health</u>, 497 U.S. 261, 278 (1990); cf., e.g., <u>Riggins v. Nevada</u>, 504 U.S. 127, 135 (1992); <u>Washington v. Harper</u>, 494 U.S. 210 (1990); see also, e.g., <u>Rochin v. California</u>, 342 U.S. 165 (1952); <u>Jacobson v. Massachusetts</u>, 197 U.S. 11, 24–30 (1905).

That is to say, the Supreme Court's expansion of the concept of individual liberty in the years since <u>Roe</u> stands for a recognition of the principle that when individual liberty is in conflict with even the protection of life, individual liberty is nonetheless a priority (even if it is not *the* priority). The Court compares this finding with <u>Jacobson</u>, which did not recognize individual liberty as a priority that could potentially override the collective right. <u>Jacobson</u> recognized that people, in general, have a liberty interest in being treated fairly – so long as fairly means no worse than anyone else over whose rights the government might assert dominion, i.e. "'liberty regulated by law." But <u>Jacobson</u> did not recognize the individual right as being superior to the collective's like <u>Roe</u> and <u>Casey</u> do.

As Justice Gorsuch points out a recent concurrence, the right at issue in <u>Jacobson</u> was the right to be free from a $5 fine. <u>Roman Cath. Diocese of Brooklyn v. Cuomo</u>, 141 S.Ct. 63, 70 (2020). That is wholly different from one's right to earn a livelihood, pay rent, and put food on the family table. <u>Jacobson</u> is not (as the late Hon. Milton Shadur used to quip about Defendants' attitudes regarding the <u>Iqbal</u> and <u>Twombly</u> decisions) a "get out of jail free card." Justice Gorsuch asks:

> Why have some mistaken this Court's modest decision in Jacobson for a towering authority that overshadows the Constitution during a pandemic? In the end, I can only surmise that much of the answer lies in a particular judicial impulse to stay out of the way in times of crisis. But if that impulse may be understandable or even admirable in other circumstances, we may not shelter in place when the Constitution is under attack. Things never go well when we do. *Id.* at 71.

All of this leads inexorably to Klaasen v. Trustees of Indiana Univ., 7 F.4th 952 (2021). Though only a few short months have passed since it was decided, our understanding of COVID-19 and of COVID-19 vaccines has developed since then[22]. Illinois also has passed from the "High" level CDC benchmark to the lower "Substantial" level. The trend in Illinois for new COVID-19 cases is now on a strongly downward trend, with cases at their lowest point since August 6th at the time of this writing.[23] As the world becomes safer, as many are returning to normalcy[24], and as Illinois' rates of infection drop, it is irrational for Illinois to be imposing ever more restrictive demands on people's individual liberty. The exigencies of our situation demand that Illinois residents, including these Plaintiffs, become freer, not less free[25].

The Klaasen decision does not address the newest information, cited above, about vaccine efficacy, or the superiority of natural immunity to vaccine immunity. It does not (as it could not have) analyzed the facts on the ground in October, 2021, in its determination that the right to attend a university (which the Court implies at several points is akin to a privilege) could be premised upon vaccination or testing.

---

[22] Since the pandemic began, each month has felt like a year; and yet it feels like the good old days of February 2020 were mere weeks ago.
[23] https://abc7chicago.com/covid-illinois-cases-coronavirus-19/11121798/
[24] https://www.npr.org/2021/09/10/1036136246/covid-denmark-eu-restrictions
[25] In response to the anticipated counter that the positive direction should be encouraged by additional mitigation, like vaccine mandates, it should be noted that the enforcement provisions of the mandates have not been put into effect by the time of filing. The uptick in cases self-corrected over time without, even arguably, the aid of vaccine mandates.

In Klaasen, the Seventh Circuit had an early shot at addressing vaccine mandates. The decision is quite short, but nonetheless is illuminating. Its analysis opens by stating "given Jacobson v. Massachusetts, which holds that a state may require all members of the public to be vaccinated against smallpox, there can't be a constitutional problem with vaccination against SARS-CoV-2." Klaasen, 7 F.4th at 593(citations omitted). This line has largely been quoted in isolation. The decision, however, continues. It recognizes that the plaintiffs in that matter argue that the rational-basis standard used in Jacobson does not offer sufficient protection, but notes that "a court of appeals must apply the law established by the Supreme Court." *Id.* It offers no analysis or Casey or Roe, which were also established by the Supreme Court.

The decision also points out that Indiana University has exceptions for persons who declare vaccinations incompatible with their religious beliefs, or for people for whom vaccination is contraindicated. *Id.* Unlike Jacobson, Indiana does not require every adult member of the public to be vaccinated. *Id.* Rather, vaccination is a condition of attending school (and people who do not want to be vaccinated may go elsewhere). *Id.* It notes that there is a right in bodily integrity, just like there is a right to hold property, but that parents must give up their property in order to pay the university's tuition. *Id.* It also notes that though there is a First Amendment right not to be forced to read or write things they prefer not to read or write, but that a student must read and right what is assigned. *Id.* Based on the fact that students must give up rights in order to attend university, Klaasen finds that the right one's bodily integrity – a fundamental right – can nonetheless be forfeit as the price of admission.

That makes this case different from that one. This case involves public employment. One component of substantive due process is the right to earn a living free from "unreasonable governmental interference." Minerva Dairy, Inc. v. Harsdorf, 905 F.3d 1047, 1053 (7th Cir. 2018). That right is part of the right to follow a chosen profession that is included in the right to liberty and

11

property, generally. Greene v. McElroy, 360 U.S. 474, 492 (1959). In Greene, the Supreme Court found that absent the proper procedure, it was a deprivation of liberty and property to revoke a party's security clearance, rendering him unable to be employed by his private company employer. *Id.* at 508. By the same token, even if an employee has no property interest in continued *public* employment, the determination to terminate or not to renew a public employment contract cannot be premised upon the employee's protected activities. Perry v. Sindermann, 408 U.S. 593 (1972).

Employment is different from college education. College education could ostensibly be called a privilege – as evidence by the existence of entrance standards and the requirement of tuition payments. Even if these parties had not contractual basis to expect their continued employment, they cannot be compelled to violate their rights on pain of losing their jobs. Importantly, in Klaasen, the Court noted that the existence of a testing option was significant. Here, the testing option is eliminated at the end of December. Plaintiffs will be told to vaccinate or lose their jobs. It was unfortunate that Klaasen did not examine the ways in which Jacobson has been modified and limited over the centuries. In so confining its treatment of Jacobson, it is possible that Klaasen did exactly what Justice Gorsuch warned of in treating Jacobson like a "towering authority that overshadows the Constitution during a pandemic." Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S.Ct. 63, 71 (2020). But even still, Klaasen does not require this Court to find that a person's job can be forfeit if they do not submit to a violation of their fundamental rights.

Finally, to the extent that this Court finds that Klaasen renders it unable to grant Plaintiffs' substantive due process counts on a preliminary basis, Plaintiffs nonetheless argue to the contrary here to preserve the matter for appeal.

Chicago similarly argues that the weight of authority cautions in favor of giving public officials great deference to enact measures to protect public health. It cites the concurrence with the denial of certiorari in the matter of S. Bay United Pentecostal Church v. Newsom. 140 S.Ct. 1613

12

(2020). There, Chief Justice Roberts notes that when public officials "undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad." *Id.* at 1613, citing <u>Marshall v. United States</u>, 414 U.S. 417, 427 (1974). The quote largely comes from <u>Marshall</u>, but the complete and unredacted quote (while not immediately relevant to <u>S. Bay United Pentecostal Church</u>) is instructive here:

> When Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation, even assuming, arguendo, that judges with more direct exposure to the problem might make wiser choices. *Id.*

Legislative enactments do, indeed, enjoy broad latitude. But there was no legislative enactment here. This point may be more relevant in the upcoming section on procedural due process, but it bears noting that the wide latitude given to legislative enactments stems from the deference typically given to laws that are the product of our democratic process, given the recognition that judges are not legislators. The executives who have acted unilaterally here, however, are not legislators.

The City also points to <u>Maniscalco v. New York City Dep't of Educ</u>., No. 21-CV-5055 (BMC), 2021 WL 4344267, at *3 (E.D.N.Y. Sept. 23, 2021). That decision upheld vaccine mandates instituted by the New York Department of Education, finding that "[r]equiring that DOE employees take a dose of ivermectin as a condition of employment might qualify as 'a plain, palpable invasion' of such rights, not having any real relation to the public health crisis. However, mandating a vaccine approved by the FDA does not." *Id.* Here too, the Court suggests that while <u>Jacobson</u> gives public officials wide latitude, it does not give unlimited latitude: had public officials required teachers to take a dose of ivermectin, that decision would not be given deference because ivermectin is assumed to be unhelpful. This means, however, that if the facts on the ground suggest that natural immunity is superior to vaccine immunity, that this Court can and should take that into consideration in rendering its decision here without violating <u>Jacobson</u>.

III.     *There is a likelihood of success on Plaintiffs' procedural due process claim.*

Defendants' respective arguments on the subject of procedural due process are very different from one another, quite understandably. The City's argument focuses on the power of the Mayor to manage personnel, while the Governor's focuses on the Eleventh Amendment, which does not protect the City.

The City points out that the Mayor is vested with authority to "supervise the conduct of all officers of the city." Chicago Mun. Code 2-4-020. The Mayor's "administrative office, subject to the direction and control of the mayor, shall supervise the administrative management of all city departments, boards, commissioners and other city agencies established by this code and the laws of the state." *Id.* A supervisor is an overseer who ensures that somebody else's rules are being followed. For example, a supervisor at a plant ensures that the plant's processes are being followed. The supervisor may be able to create rules, but the rules are in line with the preset expectations of the plant. The same is true of management. A manager is someone who sets policy within an existing framework. In this case, the framework is established by the very ordinance the City cites: the Mayor's administrative office supervises the administrative management of employees "established by this code and the laws of this state." The Mayor's power to manage is therefore limited by the City ordinances and subject to them.

Whether there is a substantive due process right to bodily autonomy that protects against forced COVID-19 vaccination, it cannot be argued that requiring all City employees to vaccinate is not an imposition. Such an imposition, which fundamentally changes the nature of the employment agreement, cannot be called simple management or supervision[26].

---

[26] By way of example, a manager may be permitted to create policies around the type of language that is permissible in the workplace, even absent direction from a CEO. But a manager would be overstepping his authority were he to declare unilaterally that their McDonald's branch is now in the business of selling iPhones instead of burgers.

The City further suggests that since the mandate is a legislative enactment, that no further procedural due process is necessary because the legislative process is the procedure. See Harris v. Univ. of Massachusetts, Lowell, No. 21-CV-11244-DJC, 2021 WL 3848012, at *5 (D. Mass. Aug. 27, 2021)("Policy is generally applicable to all students and formulated prospectively toward the fall semester, i.e., a legislative rule rather than an adjudication, they are 'not entitled to [process] above and beyond the notice provided by the enactment and publication' of the Vaccine Policy itself). But "to determine whether an act is legislative in form, courts look at whether the defendants acted pursuant to constitutional or statutory procedures." Bagley v. Blagojevich, 646 F.3d 378, 392 (7th Cir. 2011). "In addition, the act must be 'procedurally' legislative, that is, passed by means of established legislative procedures." Id. quoting Gallas v. Supreme Court of Pa., 211 F.3d 760, 774 (3d Cir. 2000).

The City's argument therefore simply begs the question. If the Mayor's unilateral order followed the "established legislative procedure," the other trappings of procedural due process (notice, hearing, etc.) are unnecessary. If the Mayor's unilateral order did not follow the established legislative procedure, that itself is the violation. In this case, the closest the Mayor has come to arguing that the unilateral order followed the established procedure is to point at ordinances giving her the power to supervise and manage employees. But the legislative process implies, at the most basic level, an act of the legislature. In this case, the closest the City has to a legislature is the City Council. In the absence of a vote of the City Council, the Mayor's unilateral order is not a legislative act.

The Governor's argument focuses solely on the Eleventh Amendment. Therefore, if that argument fails, the Governor offers no compelling basis to object to Plaintiffs' claim under the doctrine of procedural due process. As will be argued, the Governor's argument must fail.

15

The Eleventh Amendment does not bar this Court from deciding that the Mandate violates procedural due process. "A suit challenging the constitutionality of a state official's action is not one against the State" for the purpose of the Eleventh Amendment. Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 102 (1984), citing Ex parte Young, 209 U. S. 123 (1908); see also Vill. of Orland Park v. Pritzker, 475 F. Supp. 3d 866, 887 (N.D. Ill. 2020). Under Young, "an unconstitutional enactment is 'void' and therefore does not 'impart to [the officer] any immunity from responsibility to the supreme authority of the United States.'" Id. For that reason, "when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief." Id. at 102-3. Similarly, a state officer loses sovereign immunity when he acts without any authority whatever." Id. at 102, fn. 1. This is not the case, however, when a suit in federal court seeks to enforce state law against state officials. Id. at 106. Similarly, there is no constitutional procedural due process right to state-mandated procedures GEFT Outdoors, LLC v. City of Westfield, 922 F.3d 357, 366 (7th Cir., 2019).

Far from finding that challenges to the Governor's authority under procedural due process are somehow barred by the Eleventh Amendment doctrine of sovereign immunity, as the Governor argues, Cassel v. Snyders, 990 F.3d 539 (7th Cir., 2021) simply finds that Plaintiffs in that matter did not argue procedural due process: "The plaintiffs' attempt to constitutionalize their state-law procedural argument is thus forfeited because it is new on appeal." Id. at 551. The District Court's decision in that matter identifies the prong of the Illinois Emergency Management Act that the challenged Executive Order was found to fall under. Under that statute, the Governor has the power to "[t]o control... the movement of persons within the area, and the occupancy of premises therein." 20 ILCS 3305/7(8). In reality, the "liberty to follow a trade, profession, or other calling" has long been recognized as a liberty interest specifically protected by procedural due process. Vill.

of Orland Park, 475 F. Supp. at 884, citing Wroblewski v. City of Washburn, 965 F.2d 452, 455 (7th Cir. 1992) and Zorzi v. Cty. of Putnam, 30 F.3d 885, 895 (7th Cir. 1994).

The Governor's Response describes the Petition as attempting to enforce the Illinois Emergency Management Act. This is incorrect. The Petition seeks to enforce Plaintiffs' procedural due process rights to follow a trade, profession or other calling, and to be free from intrusions against privacy and bodily autonomy. The challenged Executive Order not only threatens their ability to work for their present employer in their chosen profession unless they agree to an intrusion into their privacy and their bodily autonomy. In analyzing Plaintiffs' substantive due process claim, the Governor emphasizes the fact that a person's right to be free from state-enforced medication is not inviolate under Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 278 (1990), cited by Plaintiffs' petition. Indeed, Cruzan ultimately finds that the liberty interest in one's autonomy can be abrogated, in the case of incompetent incarcerated persons, since *procedural* safeguards existed. *Id.* at 279. Plaintiffs therefore have a procedural due process interest when it comes to the right to follow a trade or profession, and when it comes to their right in their bodily autonomy.

The reference, in both the Complaint and the Petition, to the Illinois Emergency Management Act was to demonstrate, *as the Complaint states explicitly*, "what the statute does not state." Complaint at ¶ 45. There is no authority, and no arguable authority, under the Illinois Emergency Management Act, to force employers to fire their employees, or to force individuals to either vaccinate or to submit to weekly testing. 20 ILCS 3305/7. It perhaps could have been argued that an attempt to "enforce"[27] the Emergency Management Act as against lockdowns could turn on

---

[27] Enforce is in quotes here because the Act gives the governor certain powers. It does not give the people rights. Therefore, it is not entirely correct to deem any suit challenging COVID-19 mitigation measures – save perhaps one to impose the 30 day limitation contained in the act, which seemingly limits the Governor's power – a suit to "enforce" the Act. Rather, such would be a suit to protect one's rights as against the Governor's expansive, but nonetheless limited, power under the Act.

the interpretation of the Act's grant of emergency power to "control ingress and egress to and from a disaster area, the movement of persons within the area, and the occupancy of premises therein." 20 ILCS 3305/7(8). But the act contains fourteen explicit and enumerated powers, none of which even arguably grants the Governor the power he has here taken for himself. This is, therefore, not a suit concerning an allegedly mistaken interpretation of the Act. See Vill. of Orland Park, 475 F. Supp. at 884.

Interestingly, the Governor never argues otherwise. The Response contains no analysis of the Emergency Management Act. Perhaps little can be inferred from that, but it is nonetheless noteworthy that in a lengthy brief, complete with well-written, and extremely erudite treatment of the various scientific and constitutional issues before this Court, no attempt was made to explain the legislative basis for the Governor's actions.

If there is no substantive due process right to be categorically free from the kinds of intrusions that the Executive Order demands here, there is nonetheless a procedure, recognized in Jacobson, for authorizing them: the democratic process, in which the legislature meets to propose laws, debate their wisdom, and ultimately pass them and send them to the Governor's desk for signature. That never happened here; and while the Courts in this Circuit have held that the various other COVID-19 mitigation measures were authorized by the Emergency Management Act, they have never found – and could not find – that the sweeping measures contained in *this* Executive Order are authorized under any of that Act's enumerated powers.

IV.    *There is a likelihood of success on Plaintiff's claim, against the City, under the Health Care Right of Conscience Act.*

The Governor argues that the Eleventh Amendment bars any claim against him under the Health Care Right of Conscience Act, which is a state law. The Governor is likely correct about this. However, the City of Chicago has no such defense under the Eleventh Amendment. The Health

18

Care Right of Conscience Act as about as straightforward as possible. It prohibits discrimination in employment on the basis of a refusal to take medical treatment. Here, the City is proposing to terminate employees on the basis of their refusal to take the COVID-19 vaccine, which is a form of medical treatment. There is no good argument against the application of this law to the facts here. That the law was written at a different time and for a different purpose is of no consequence, given its simple and indisputable phrasing.

It could certainly be argued (and likely was) that the Illinois Emergency Management Act's reference to controlling ingress and egress over an effected area was never meant to give the Governor *carte blanche* to prevent sectors from engaging in nearly all economic activity over the *whole of the state*, but – as this Court ruled in Cassell v. Snyders, 458 F. Supp. 3d 981 (N.D. Ill. 2020) – the text of the law controls.

V.    *There is a likelihood of success on Plaintiff's Free Exercise clause claim.*

The First Amendment prohibits a state or municipality from "prohibiting the free exercise" of religion. "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions," triggers strict scrutiny under the Free Exercise Clause. Trinity Lutheran Church of Colombia Inc. v. Comer, 137 S.Ct. 2012, 2022 (2017), cited by Dahl v. Board of Trustees of Western Michigan Univ., _____ F.4th _____ (6 Cir., 2021)("finding that the vaccine mandate employed by Western Michigan University violated the Free Exercise clause when requests for religious accommodations were rejected."). "A policy that forces a person to choose between observing her religious beliefs and receiving a generally available government benefit for which she is otherwise qualified burdens her free exercise rights." Dahl, citing Fulton v. City of Phila., 141 S. Ct. 1868, 1867 (2021), and Trinity Luterhan, 137 S.Ct. at 2023. "The reason is simple: denying a person "an equal share of the rights, benefits, and privileges enjoyed by other citizens because of her faith discourages

19

religious activity." <u>Dahl</u>, citing <u>Lying v. Nw. Indian Cemetery Protective Ass'n</u>, 485 U.S., 439, 449 (1988).

In Response, the City argues that many (over 1000!) City employees sought a religious exemption to the upcoming hard vaccine mandate using a pre-written form that merely asserts their rights to their religion and conscience, particularly under the Health Care Right of Conscience Act, without further explaining the religious principle violated. This, however, should be enough. If it is not enough, Plaintiffs have at least triggered a requirement on the part of the City to investigate further. The City's form seeks the signature of a clergy member, though there is no good argument that this should be necessary. "Testimony… describing [one's] motivation in terms meeting the broad standard for what is religious will usually suffice" to entitle an employee to protection. <u>Davis v. Fort Bend County</u>, 765 F.3d 480 (5th Cir., 2014). The Governor's mandate recognizes this by offering a testing option for those who have a religious objection to vaccinating. It does not require Plaintiffs to jump through hoops to demonstrate that their religious beliefs are somehow worthy of the City's recognition and respect. The City attempts to turn the law on its head. It should not be permitted to do so.

VI. *Plaintiffs will experience irreparable harm if their Petition is not granted.*

Much of the Defendants' arguments concerning irreparable harm focuses on his prior argument that there is no substantive due process right to be categorically free from government imposed vaccines or testing. There is no treatment of Plaintiffs' claims under the doctrine of procedural due process. There is sparse treatment of the actual harm involved. Rather, the argument is that since there is no substantive due process right at issue, there could not be actual harm. At the outset, this is simply mistaken. The analysis of irreparable harm and likelihood of success on the merits are related but distinct. If there is a violation of constitutional rights (for example, a deprivation of a liberty interest without procedural due process), then there is irreparable harm as a

matter of law. <u>Joelner v. Village of Washington Park, Illinois</u>, 378 F.3d 613, 620 (7th Cir., 2004).

Further, as argued above, there is a right to earn a living free from "unreasonable governmental

interference." <u>Minerva Dairy, Inc. v. Harsdorf</u>, 905 F.3d 1047, 1053 (7th Cir. 2018). That right is

part of the right to follow a chosen profession that is included in the right to liberty and property,

generally. <u>Greene v. McElroy</u>, 360 U.S. 474, 492 (1959). In <u>Greene</u>, the Supreme Court ruled that

the plaintiff at issue not only had a general right to engage in a profession, but that he had a further

right to a specific job as against the government, which sought to interfere. A public employee may

not be terminated due to his refusal to violate his fundamental rights. <u>Perry v. Sindermann</u>, 408 U.S.

593 (1972). In that context, the public has a right not only in employment in general, but in his

specific employment at his present job. This is on top of the general concept of liberty that

encompasses the liberty to follow a trade, profession or other calling. <u>Wroblewski v. City of

Washburn</u>, 965 F.2d 452, 455 (7th Cir.1992). Defendants seek to deprive Plaintiffs of that for their

refusal to violate their fundamental rights. That is irreparable harm as a matter of law.

      It is true that an unreasonable delay in bringing a petition for a preliminary injunction tends

to suggest that there is no irreparable harm. <u>Park Ridge Sports, Inc. v. Park Ridge Travel Falcons</u>,

No. 20 C 2244, 2020 WL 6265133, at *11 (N.D. Ill. Aug. 20, 2020), report and recommendation

adopted as modified, No. 20 C 2244, 2020 WL 6262394 (N.D. Ill. Oct. 23, 2020). This is because

"the extraordinary remedy of a preliminary injunction is designed to protect against future harm,

not, harm that has already passed." *Id.* citing <u>Turnell v. CentiMark Corp.</u>, 796 F.3d 656, 662 (7th Cir.

2015). But there was no delay here, and certainly not one that would suggest Plaintiffs sat on their

rights.

      The Executive Order was issued on September 3, 2021, and required a first vaccination by

September 19, 2021. However, the beginning of the Order's consequences – be terminated or

21

submit to testing – did not begin until October 15, 2021; and the hard mandate does not begin until the end of December.

Therefore, there is no reasonable claim that Plaintiffs here delayed their filing of the Petition.

VII.    *The Balancing of the hardships favors Plaintiffs.*

The balancing of the hardships favors Plaintiffs. The insistence otherwise is premised on two claims, both of which are incorrect: a.) there is little likelihood of success on the merits, and b.) the public is in grave danger if the Executive Order is struck down. The former claim is the subject of most of the rest of this brief, and needs no further treatment here. The second claim is belied by the facts on the ground. Throughout the last year and a half, including the nine months during which vaccines were widely available, there was no mandate requiring anybody, health workers included, to



vaccinate. Health workers and EMS were the front lines in addressing COVID-19. Essential employees like Plaintiffs here were not able to simply shelter in place. They have, therefore, developed important strategies for self-preservation, and for preserving the health of their patients. Illinois hit its peak, in terms of new cases, in November, 2020, but remained in a state of elevated new cases through February, 2021, as the Complaint alleges. In April, 2021, there was yet another uptick in new cases, prompting various COVID-19 mitigation efforts from government and others.

Nonetheless, there was no vaccine mandate. Nine months after vaccines became widely available, now at the tail end of a comparatively smaller uptick in cases, the Governor has declared that health workers must vaccinate, and that this is suddenly an emergency. The legislature has not

22

met and made any such determination, however. It could be argued, in April of 2020, that the situation was simply too fluid, and too fresh, to expect the legislature to meet and offer guidance and leadership to the people of Illinois. But a year and a half later, to say nothing for the nine months during which vaccines were readily available, it can hardly be argued that there has been no time for legislative action. Can it truly be argued that paramedics doing their jobs and saving lives in August and early September of this year were heroes, but that starting September 19, the identical behavior so threatened the health of the people that fundamental principles of representative democracy and due process of law must be abrogated?

Whether natural immunity provides more robust immunity than vaccine immunity, as argued by Plaintiffs, or whether it merely provides nearly comparable immunity, as suggested by many of Defendants' citations to scientific journals, it cannot seriously be argued that compliance with the Executive Order is absolutely necessary in order to promote the public good to the extent that it overcomes constitutional safeguards, and the usual requirements of representative democracy.

Finally, Defendants suggest that Plaintiffs' argument is that natural immunity must be taken into consideration in determining how to apply the Executive Order. This is not entirely correct. Plaintiffs' argument is that by ignoring natural immunity, the Executive Order articulates an arbitrary and irrational standard that cannot be squared against substantive due process, even the rational basis test. It is additionally true that employees with natural immunity from having contracted COVID-19 are no more of a danger to those around them those who have merely vaccinated. But Defendants' argument simply ignores the greater thrust of the substantive due process claims, and the entirety of Plaintiffs' procedural due process claims.

## Conclusion

The facts of this matter are largely agreed upon. Plaintiffs have been placed, against their will, in the position of either being forced to vaccinate, in order to remain employed, and otherwise

23

eligible to function as EMS personnel. The Governor's Executive Order was entered into unilaterally. It cites the Illinois Emergency Management Act as giving the Governor the power to do this, but the Illinois Emergency Management Act enumerates the powers of the Governor in a state of emergency. None of the enumerated powers includes the power to require the termination of people who do not work for the State of Illinois. None of the enumerated powers includes the power to force vaccination, or the power to force weekly testing for communicable diseases.

Similarly, the City of Chicago is under its even more onerous mandate not because the City Council met and deliberated, but because the Mayor simply said so. This is the opposite of how a democracy is supposed to work, and it is contrary to due process.

The legal import of these facts is that that Plaintiffs are being deprived of their liberty interests in their occupations and the autonomy without due process of law. The vaccine mandates also violate substantive due process inasmuch as they subordinates the rights to privacy and bodily autonomy to the collective right in violation of longstanding precedent like Roe and Casey, cited above. If this Court does not enjoin enforcement of the Executive Order, Plaintiffs will experience irreparable harm in that their constitutional rights will be violated, and in that their privacy (or their ability to practice their occupation) will continue to be violated. The balancing of the hardships favors Plaintiffs.

The constitution prescribes a government that answers to the people, who are represented by the individual members of the legislature. A process in which a governor, even an elected governor, legislates unilaterally is constitutionally infirm. Similarly infirm is an Executive Order that arbitrarily subordinates the well-recognized rights of privacy and bodily autonomy unnecessarily. Some of these Plaintiffs are EMS members, heroes who have put their health on the line from the beginning of this pandemic. Others are essential elements of the City's proper functioning who have come to work and done their job despite the pandemic and the uncertainty around it. But at all times

24

until now, they did so willingly. Now, Defendants seek to force them to violate their deeply held beliefs, or to sacrifice their autonomy as a punishment for not doing so. This should be enjoined.

WHEREFORE, Plaintiffs request that this Honorable Court enter a Preliminary Injunction finding that Executive Order 2021-22, and the corresponding City of Chicago mandate is unconstitutional and enjoining their enforcement by these Defendants pending the ultimate resolution of this matter.


Respectfully Submitted,

s/Jonathan Lubin
Attorney for Plaintiffs

Jonathan Lubin
8800 Bronx Ave.
Suite 100H
Skokie, IL 60077
773 954 2608
jonathan@lubinlegal.com

## CERTIFICATE OF SERVICE

I, Jonathan Lubin, hereby certify that I caused a copy of this instrument to be served upon all parties of record by filing it with the Clerk of the Court for the United States District Court for the Northern District of Illinois, in accordance with the Federal Rules of Civil Procedure and all local rules, on October 28, 2021.

s/Jonathan Lubin